54  156
72  129

CHARLES U. COTTING vs. THE NEW YORK & NEW ENGLAND RAILROAD COMPANY.

New Haven Co., June T., 1886.  PARK, C. J., CARPENTER, PARDEE, LOOMIS AND GRANGER, JS.

A railroad company for the purpose of raising money to pay a large floating indebtedness, issued under legislative authority and sold for cash nineteen thousand shares of preferred stock, dividends on which to the amount of seven per cent. annually were to be paid from the net earnings of the company before any dividends on the common stock, the seven per cent., or any part of it, where not paid by dividends, to accumulate. A general statute provided that no corporation should declare any dividend while its capital was impaired. There had been a large deficiency prior to the issuing of the new stock. Held that a dividend could be made on the preferred stock out of the net earings of the road since the issuing of the same, without regard to the prior deficiency.

[Argued June 3d—decided July 20th, 1886.]

AMICABLE SUIT upon an agreed statement of facts, brought to the Superior Court in New Haven County, and

reserved for the advice of this court. The question submitted was as to the right of the defendant company to declare a dividend on its preferred stock while the capital stock of the company was impaired. The case is fully stated in the opinion.

*H. D. Hyde,* of Boston, and *A. Brandegee,* for the plaintiff.

It is provided by statute that no " corporation shall declare any dividend while its capital is impaired, and all officers who shall vote in favor of declaring such dividend, in case such dividend is declared, knowing or having the means of knowledge that such capital is impaired, shall be jointly and severally liable in an action on this statute for all losses resulting from said declaration of dividend, and be guilty of a misdemeanor." Gen. Stat., p. 280, sec. 16. The General Assembly in 1884 passed the following special act with regard to the present railroad company :—

" Said railroad company is authorized, by consent of a majority in interest of the whole amount of its stock, the same to be represented in person or by proxy at a meeting duly called for that purpose, to issue not exceeding fifty thousand shares of preferred stock of the par value of one hundred dollars each, the holders of which shall be entitled to receive out of the net earnings of the company dividends of seven per cent. per annum, the same to be paid in semi-annual instalments in such sums as the directors of said corporation may determine : and if the net earnings of any year shall not be sufficient to pay said dividends, the same shall be cumulative and payable out of the net earnings of any subsequent year, but without interest; said dividends and accumulations to take priority over the dividends on all other stock of the company, until, in addition to said dividends on said preferred stock, there shall be paid an equal dividend upon the common stock, after which any dividend declared by said company shall be divided equally between said preferred and common stock."

Prior to the passage of this special act it is clear, under

the General Statutes, if applicable, that no dividend could be paid upon the common stock of the company so long as the deficiency of $704,095.45 mentioned in the submission exists. It appears by the submission that the net earnings of the company for the six months ending March 31st, 1886, amount to the sum of $93,413.38, and that there are no debts or liabilities now due or payable on which the same is needed. The number of shares of preferred stock issued is 19,000, bearing dividends at the rate of seven per cent. per annum, and there is due upon the same a six months' dividend amounting to $66,500. The special act, as agreed in the submission, was passed for the purpose of enabling said company to pay its floating debt, amounting to the sum of about two million dollars, and to discharge the receiver, who was then in possession of the property of the company. It could be of no service to the company unless it should enable it to market the preferred stock authorized, and thereby pay the floating debt and discharge the receiver. To do this the company was authorized to pay seven per cent. upon its preferred stock, with the right to further dividends after the common stock. The special act was therefore an emergency act to save the corporation and prevent the foreclosure of its mortgages, and is to be construed in the light of the emergency and the purpose for which it was passed.

If the legislature had intended that the preferred stock should receive dividends only when there was no impairment of capital, and when the dividends had been earned, it would have said so. The act provides that the holders of preferred stock " shall be entitled to receive out of the net earnings of the company dividends of seven per cent. per annum, the same to be paid in semi-annual instalments in such sums as the directors of said corporation may determine ; and if the net earnings of any year shall not be sufficient to pay said dividends, the same shall be cumulative and payable out of the net earnings of any subsequent year."

The purchaser of preferred stock is clearly entitled to all

the benefits of the statute authorizing its issue, and the only limitation upon his right is, that the net earnings shall be sufficient to pay the dividends, and that the payments shall be made each year, if possible. The company, at the time the act was passed, was in the hands of a receiver, and had a floating debt of about two million, which the sale of the preferred stock has paid, from which the legislature and the purchaser of preferred stock had a right to infer that there might be an impairment of capital for several years; and if that impairment be made up out of net earnings before any dividends could be earned and applied to preferred stock, neither the legislature nor the company could have reasonably believed that the preferred stock would have found a market in time to have relieved the necessities of the company and to have prevented a foreclosure.

The General Statutes say there shall be no dividends declared while the capital is impaired. With this law in force the corporation is doomed and foreclosure of its mortgage inevitable. The legislature intervenes by a special act, and gives the corporation special power and authority for a special purpose, and the special act must be construed with reference to the existing state of affairs and such special purpose. To give it any other interpretation is to make the act nugatory and worthless. To construe the act as authorizing the directors to pay dividends on preferred stock out of the net earnings without reference to the impairment of capital, is the only construction consistent with the situation of the company at the time the act was passed, and with the purpose for which it was passed. A special act of itself indicates that the existing law is deficient or lacking in some respect, and is passed to supply that deficiency. The corporation was tied hand and foot under the then existing laws. The special act was to release it, and the court, in construing the statute, will keep this fact constantly in mind.

It is difficult to cite authorities relating to special acts, for each act is enacted with reference to the peculiar circumstances of each case, which rarely are found to exist in

a subsequent case, and the real meaning of the act must be determined by the court upon a consideration of the special circumstances under which it was passed, and without much assistance from analogous cases. The following cases support the construction claimed by the plaintiff : *Dent* v. *London Tramway Co.*, L. R., 16 Ch. Div., 353; *Williams* v. *Parker*, 136 Mass., 204; *West Chester & Penn. R. R. Co.* v. *Jackson*, 77 Penn. St., 321; *Nickals* v. *New York, &c., R. R. Co.*, 15 Fed. Rep., 575; *Town of Granby* v. *Thurston*, 23 Conn. 420; *State* v. *Norwich & Worcester R. R. Co.*, 30 id., 290; *Stoddard* v. *Shetucket Foundry Co.*, 34 id., 542.

*S. E. Baldwin*, for the defendant.

1. Dividends cannot be declared on an impaired capital. "It is a fundamental rule that dividends can be paid only out of the profits, or the net increase of the capital of a corporation, and cannot be drawn upon the capital contributed by the shareholders for the purpose of carrying on the company's business. * * * The managing agents, and even the holders of a majority of shares, have no authority to diminish the prescribed capital of the company, by distributing a portion of it among the stockholders in the shape of dividends." Morawetz on Private Corporations, § 344; 2 Redfield on Railways, § 240; Thompson on Stockholders' Liabilities, §§ 18, 19. "The stock of a corporation is its only basis of credit. Unlike a partnership, its members generally are not individually liable for its debts. * * * Hence it is of vital importance that the law should rigidly guard and protect the capital stock. Otherwise, especially in these days, when so large a portion of the business of the country is carried on by corporations, confidence, on which the prosperity of the country largely depends, would be seriously impaired. Hence it is that in equity the capital stock of a corporation is now regarded as a trust fund for the payment of debts. The creditors have a lien upon it, which is prior in point of right to any claim which the stockholders, as such, can have upon it; and courts will be astute to detect and defeat any scheme or device which is

calculated to withdraw this fund, or in any way to place it beyond the reach of creditors." *Crandall* v. *Lincoln*, 52 Conn., 73, 94. Our statutes expressly recognize these principles, and provide an adequate sanction. Gen. Stat., p. 280, sec. 16. A statute equally explicit has existed since 1828 in New York, another of the states by which the company is chartered. Rev. Stat. of N. York, ch. 18, part. 1, tit. 4, § 2. This statute has been recently construed by the Court of Appeals of that state, in a suit brought to enjoin the Western Union Telegraph Co. from declaring a stock dividend, and the views we have presented, sustained and enforced. *Williams* v. *Western Union Telegraph Co.*, 93 N. York, 162, 188. The defendant company, chartered by four states, is subject to the laws of each of them, and is in each state for all the purposes of local government a domestic corporation. *Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S., 307, 333. It is therefore subject to the provisions of the general statutes of Connecticut and New York as fully as if both states had precisely the same laws.

2. Unless the Preferred Stock Act of 1884 has relaxed these general rules of law, and modified the provisions above cited from the public statutes, it would seem that no dividend can be declared out of the preferred stock of the company any more than on its common stock, while its capital remains impaired. Preferred stock is, as to dividends, preferred to ordinary stock. " But it is stock, and part of the capital stock, with the characteristics of capital stock. One of such characteristics is that no part of the property of a corporation shall go to reimburse the principal or capital stock, until all the debts of the corporation have been paid. It would require the clearest language to admit of the application of a different rule to any capital stock. * * * The holders of preferred stock have the same relation by virtue of the certificate to the corpus of the property which they have to its net earnings. Their position in regard to both is one inferior to that of all creditors. They are not preferred as to reimbursement of principal, or as to a right to net earnings over any one but the holders of common

stock. The interest to be paid to them is not to be paid absolutely, as to a creditor, but only out of net earnings, the same fund out of which the dividends on common stock are to be paid. Though called "interest," it is really a dividend, because to be paid on stock, and out of net profits. * * * Creditors may resort to the body of their creditor's property for interest as well as principal. But these holders of the preferred stock 'are limited, for any increase or interest, to the net earnings. There is nothing in the certificate which clothes them with a single attribute of a creditor, while it specially gives them, as stockholders, an oqual interest with the stockholders in the net earnings in each year, after paying therefrom seven per cent. on each share of stock, preferred and common." *Warren* v. *King*, 108 U. S. Reps., 389, 396, 398. In the foregoing case the stock certificates made the preferred stock " a first claim upon the property of the company after its indebtedness," and spoke of their seven per cent. as "interest," yet it was held that they had no rights to the corpus of the railroad property, or against subsequent creditors, in case of a foreclosure. A preferred stockholder has the right to vote and share in directing the affairs of the corporation, and a right to share in its surplus profits, if any, after each class of stock has received a dividend, and such rights are inconsistent with the position of a creditor. The act of 1884 entitles the plaintiff to a dividend out of the net earnings. But such net earnings can only come from a net increase of the capital or principal assets, so that it is worth more, or at least on the books of the corporation is valued as worth more, than the amount of the capital stock issued. The term " net earnings," in the sense intended by the act, obviously means that both operating expenses and fixed charges shall be deducted from the gross earnings before the " net earnings " can be ascertained, and then, before they can be divided, come up the further questions of impairment of capital and the proper time to declare a dividend. " Net earnings " is the same thing as " net profits." *Phillips* v. *Eastern R. R. Co.*, 138 Mass., 129. The balance

sheet of the company shows that it owes over $16,000,000. Most of this is secured by mortgage, and not yet payable. About $355,000 is apparently payable presently, and is over-balanced by some $500,000 now due to the company. But all are debts due now, and certainly payable some day. Suppose that there were floating debts now not only payable but pressed for payment, to the amount of the dividend claimed. Would it be contended that such creditors could be postponed, or the funds withdrawn to which they would naturally resort,—cash, rather than an equity of redemption in a railroad under fifteen millions of mortgages? In the case of the Rutland Railroad this question was presented. A second mortgage, having been foreclosed, was turned into stock, the charter authorizing the issue of a preferred or guaranteed stock in exchange for the first mortgage bonds. This stock was to be entitled to receive seven per cent. dividends from the "earnings and income" of the road. Such stock was issued, and the new company having earned enough to pay the dividends, during a certain period, a preferred stockholder brought suit to compel payment. The new company, however, had run up a small floating debt, and claimed that no dividend could be declared till this was paid, and so the court held. *Chaffee* v. *Rutland R. R. Co.*, 55 Verm., 110. Another recent case in point is that of the Belfast and Moosehead Lake Railroad, in Maine. There was a preferred stock of about $380,000, and the by-laws provided that "dividends on the preferred stock shall first be made semi-annually from the net earnings of said road, not exceeding six per centum per annum, after which dividend, if there shall remain a surplus, a dividend shall be made upon the non-preferred stock," &c. The road cost over a million, and in 1882 had $10,000 on hand in cash, and a sinking fund of $26,000. Its total liabilities were $150,000 mortgage bonds due in 1890, its capital stock which was almost $648,000, and a note of $101,000, to its principal stockholder, given in 1871, which had been paid down to $87,000. It was leased and had a net income of about $36,000 from the rent, out of which it was paying

four and one-half per cent. dividends on the preferred stock, and using the balance to reduce the note. Both preferred and common stockholders sued for dividends from this balance, but the court refused to order any to be declared. *Belfast & Moosehead Lake R. R. Co.* v. *Belfast*, 2 Eastern Rep., 79. In this case it will be observed that the company had a capital unimpaired, and indeed a large surplus of fixed assets over the total amount of its capital stock and debts, and yet the court left it, with annual net earnings of $36,000, to pay the preferred stockholders only $4\frac{1}{2}$ per cent., or $17,100, instead of 6 per cent. or $22,800, and to give the common stock nothing, because the directors preferred to apply the balance on what was practically a funded debt, and for a sinking fund to pay their mortgage bonds. The provisions of the act are not to be construed like those found in many charters authorizing preferred stock, where the dividends are limited in any year to the net earnings of that particular year. In the present case the full dividends are to be paid from October 1, 1885, as and whenever from the profits of any year or any series of years there are funds sufficient for the purpose. This takes it out of the reason of those cases where, because it was " now or never," preferred stockholders were allowed to claim a dividend, which would otherwise go to increase or strengthen the capital. *Nickals* v. *New York, Lake Erie & Western R. R. Co.*, 15 Fed. Rep., 575, 579, 580; *Dent* v. *London Tramway Co.*, L. R., 16 Ch., Div. 353.

CARPENTER, J. This case must be determined by its own peculiar circumstances. We find no case so nearly like it that it may fairly be regarded as a precedent.

At the beginning of the year 1884, the New York and New England Railroad Company, with a capital stock amounting to about $20,000,000, par value, and a funded debt of over $16,000,000, secured by mortgages, found itself embarrassed by a floating debt of nearly $2,000,000, for the immediate payment of which it had no means. To avoid suits and attachments, and if possible to prevent a fore-

closure of the mortgages, the property and affairs of the company were placed in the hands of a receiver. The receiver had in his possession the franchise and property of the company, subject to the mortgages, which had an earning capacity; and the possibility of the net earnings being more than sufficient to pay the interest on the funded debt, was the only source of means for the payment of the floating debt.

It was believed that the road would be able to earn enough to pay the operating expenses and fixed charges and also to pay the interest on the floating debt. Its present ability to do more was doubtful. In that state of things obviously the payment of the principal of the floating debt would have to be indefinitely postponed. It was not reasonable to suppose that the affairs of the company could continue in that condition for any considerable time. It was necessary that some scheme should be devised by which the floating debt could be paid. In this emergency the act of 1884 was passed, which authorized the company, in addition to the then existing authority, to use the proceeds of the sales of the second mortgage bonds previously authorized, but not then issued, " for the purpose of paying any present or future liabilities of said company, or to use said second mortgage bonds as collateral security for money borrowed for that purpose." It also authorized the company, by consent of a majority in interest of the whole amount of its capital stock, to issue not exceeding fifty thousand shares of preferred stock of the par value of one hundred dollars each. The company had its option to resort to either one of the methods authorized; but it was not expected that both would be resorted to, nor was it practicable to do so.

The latter mode was adopted, and preferred stock to the number of nineteen thousand shares was sold for cash, with the avails of which the floating debt was paid. Dividends on the preferred stock to the amount of seven per cent. annually were to be paid from the net earnings of the company; and the time during which the holders were entitled to such dividends commenced to run October 1st, 1885.

Consequently from that day the net earnings were pledged to the payment of such dividends. The net earnings for the first six months, ending March 31st, 1886, were more than sufficient to pay three and a half per cent. on the preferred stock. The company is willing to pay this dividend, provided it can be legally paid.

The general statute provides that "no corporation shall declare any dividend while its capital is impaired, and all officers who shall vote in favor of declaring such dividend, in case such dividend is declared, knowing or having the means of knowledge that such capital is impaired, shall be jointly and severally liable in an action on this statute for all losses resulting from said declaration of dividend, and be guilty of a misdemeanor."

The ninth paragraph of the case as stated is as follows:— " Said defendant company's general balance sheet on March 31st, 1886, showed a balance of $704,095.45, charged to profit and loss account, which represents a deficiency in its earnings, as compared with its operating expenses and fixed charges, during a period prior to October 1st, 1885." The question submitted is whether, until that deficiency is made good, any dividend can lawfully be declared and paid to the holders of the preferred stock.

The case further shows that the " sum of $93,413.38 is now on hand in the treasury of the defendant, in cash, and there are no debts or liabilities now due and payable, which the sum is needed to liquidate."

Obviously, if the second mortgage bonds had been resorted to for the purpose of raising the necessary funds, no such question could have arisen. The holders of such bonds, whether holding them in fee or as collaterals, would have been creditors and clearly entitled to interest from the net earnings, regardless of any deficiency in the accounts. While this is by no means conclusive, yet it tends to show that it was the intention of the legislature that the net earnings should be pledged to secure those who might advance money to pay the floating debt. It was immaterial to the state whether the money was raised in the one form or in

the other. The important thing to be done, in the interest of all concerned, was to raise money upon adequate security. We can hardly suppose that the legislature contemplated less security in one form than in the other. There is therefore some reason for believing that it was the will of the legislature that the holders of the preferred stock should have the same security that the holders of the second mortgage bonds would have had if such bonds had been issued under the act; and they certainly would not have been affected by the deficiency in the accounts. Nevertheless, if the holders of the preferred stock hold it as such stock is usually held, with no unusual or extraordinary rights and privileges, they must submit to the legal incidents of such stock; and among those incidents is this, that they are merely stockholders and not creditors; and that no dividends can be lawfully declared and paid to them but from net profits or surplus; and net profits or surplus ordinarily means what is left after making good the capital. It is unnecessary to cite authorities, for on this point we agree with the learned counsel for the common stockholders.

It was doubtless competent for the legislature in providing for an emergency like this, to authorize the issue of preferred stock upon such terms, within due constitutional limits, as it pleased. The vital question in the case then is, whether the legislature intended the issuing of ordinary preferred stock, or preferred stock the holders of which should be entitled to extra rights and privileges. We are of the opinion that the latter was intended. The act, referring to the stock, says :—" the holders of which shall be entitled to receive out of the net earnings of the company dividends of seven per cent. per annum, the same to be paid in semi-annual instalments, in such sums as the directors of such corporation may determine ; and if the net earnings of any year shall not be sufficient to pay said dividends, the same shall be cumulative and payable out of the net earnings of any subsequent year, but without interest; said dividends and accumulations to take priority over the dividends on all other stock of the company, until, in addition to said divi-

dends on said preferred stock, there shall be paid an equal dividend upon the common stock, after which any dividend declared by said company shall be divided equally between said preferred and common stock."

Thus the intention is clear that the annual net earnings shall be pledged for the payment of the dividends on the preferred stock for that year and any arrearages for previous years; thus securing to the holders of that stock payment of such dividends in full for every year before any dividends can be paid to the holders of the common stock.

The term " net earnings " may be, and often is, the equivalent of surplus or net profits; but we think it is not used in that sense here. As we have noticed, it is net earnings for a limited time, and not the net earnings for the whole period of time the corporation has existed. The latter may properly be called surplus or profits. To ascertain the surplus on the 31st day of March, 1886, the state of the whole account must be considered, including of course the amount charged to profit and loss prior to October 1st, 1885; but to ascertain the net earnings for the six months ending March 31st, it is only necessary to deduct from the gross earnings the operating expenses for that time, including repairs and a proportional part of the fixed charges. That in view of the circumstances is a reasonable interpretation; for it must be presumed that the legislature intended measures that should be effectual to give relief to the company. Now if it had been intended that a prior deficiency of nearly three quarters of a million should be considered in determining the net earnings, we think the legislature would have said so in express terms, or in language sufficiently broad and comprehensive to include such a deficiency. Had it done so it is highly probable that the stock would not have been taken, and thus the object of the legislature would have been defeated. As the language of the act will admit of the interpretation we have given it, and will make it more effective than any other construction, it seems to us that it is the more reasonable one.

Again. The act is an enabling one; it is also special,

applying only to this corporation and to those who may contract with it as therein prescribed. Its sole purpose being to authorize the making of certain contracts, it becomes important to inquire how the parties immediately concerned understood and applied it. Manifestly it should be enforced as both contracting parties understood it at the time, if the language used will fairly bear the meaning they gave to it, and especially if the act as thus construed is not contrary to public policy. We see nothing in it which contravenes public policy. True, the policy of the law will not permit corporations, while they continue in business, to distribute their capital among stockholders in the form of dividends; and it is not the privilege of preferred stockholders thus to consume the common stock. We do not intend so to construe this act as to allow that to be done in the case of this corporation. Hence we limit the decision to the deficiency which existed at the time of issuing the preferred stock. Should a deficiency hereafter come into existence it will stand upon a very different footing. The present deficiency existed and was known to the legislature when the act passed; the company with knowledge of its own condition entered into this contract; the common stockholders thus virtually said to subscribers to the preferred stock— " The present deficiency in the accounts shall be no obstacle to your dividends." Good faith requires that this understanding should be carried into effect. That we have correctly interpreted this transaction is apparent from the terms of the contract as contained in the certificates of stock. An examination of the certificate will show us clearly how the contracting parties construed the act. The material part is as follows:—" These shares of preferred stock are part of an issue not exceeding fifty thousand shares of one hundred dollars each, represented by certificates differing only in the year of issue. The holder of this certificate is entitled to seven per cent. annual dividend out of the net earnings of the company from the first day of October in the year above written, payable semi-annually and cumulative, without interest, before a dividend is paid

upon the common stock or upon subsequent issues of preferred stock. To entitle the holder hereof to a full annual dividend, this certificate must be surrendered at the time the last instalment of the same is paid, and exchanged for a certificate of the next year's issue."

There are three peculiar features of this certificate. In the first place, it is issued only for one year. Whenever a full dividend for one year is paid, it must be surrendered, cancelled, and a new one issued for the succeeding year. In this respect, and so far as dividends are concerned, it is a mere certificate of indebtedness. The object of this is not very apparent, but was probably designed to promote convenience in keeping the accounts. The stock account will show what dividends are paid in full and what are in arrears. This was considered desirable on account of the second peculiar feature of the certificate, which is, that dividends are cumulative. Ordinary preferred stock payable from the surplus, or net profits, takes its chances with common stock; and if, from any cause, a dividend fails, it is gone. But here the agreed dividend, however long payment may be deferred, keeps its place as a lien upon the net earnings, and must be paid in full before any payment can be made to the holders of the common stock. In this respect the preferred dividends closely resemble the interest on bonds. This evinces an intention that the holders of preferred stock shall have special advantages. In form stock is sold and issued, and the purchasers become stockholders, but in substance, as to dividends, they have the advantages of creditors. Then, in the third place, the dividends are to be paid from the net earnings from a given time—October 1st, 1885. At that time this deficiency existed, but as it did not represent a debt calling for immediate payment, the legislature said to the company—" You may raise money in either one of the two ways indicated, by pledging your net annual earnings as security, and whichever way you may adopt the apparent deficiency shall not affect the security."

The company accepted the proposition and embodied it

in the certificates of stock. We cannot doubt that the parties to the contract so understood it. Clearly it should be enforced as the parties intended it. Otherwise we shall substitute for the contract which the parties did make, one which they did not make. In that event one party will surely be defrauded.

The Superior Court is advised that the company may lawfully declare and pay the proposed dividend.

In this opinion the other judges concurred.