### GRAND TRAVERSE HOTEL CO. v. UNITED STATES.

Civ. No. 431.

United States District Court
W. D. Michigan, S. D.

Sept. 9, 1948.

Philip W. Buchen and Butterfield, Amberg, Law & Buchen, all of Grand Rapids, Mich., for plaintiff.

Theron Lamar Caudle, Asst. Atty. Gen., of the United States, Andrew D. Sharpe and Philip R. Miller, Sp. Assts. to the Atty. Gen. of the United States, and Joseph F. Deeb, U. S., Atty., and Theodore H. Elferdink, Asst. U. S. Atty., both of Grand Rapids, Mich., for defendant.

STARR, District Judge.

Plaintiff, a Michigan corporation, began the present suit to obtain a refund of undistributed profits surtax deficiencies which it had been required to pay for its taxable year ending April 30, 1937, in the amount of $1,706.48, and for its taxable year ending April 30, 1938, in the amount of $1,466.98, together with interest paid in the amount of $723.29, making a total of $3,896.75. The case was submitted on the following stipulation of facts:

"The parties hereto, by their respective counsel, hereby stipulate that the following facts are true, so that either party may introduce all or any of them in evidence as admitted by the other, reserving to the other the right to object on the grounds of immateriality or irrelevancy to any issue before the court.

"1. Plaintiff is a corporation incorporated under the laws of Michigan with its principal office for the transaction of business in the city of Traverse City, in said State. Plaintiff's name was formerly Park Place Hotel Company under which name the returns and claims hereinafter mentioned were filed. By amendment to its articles of incorporation plaintiff's present name was adopted on April 24, 1943. This action is against the United States for the recovery of internal revenue taxes alleged to have been erroneously or illegally assessed and collected, as hereinafter more fully appears, the claim for which does not exceed the sum of $10,000.

"2. The plaintiff filed its income tax returns pursuant to the applicable Internal Revenue Acts of the United States for each of plaintiff's taxable years ended April 30, 1937, and April 30, 1938, with the Collector of Internal Revenue at Detroit, Michigan, and tax liabilities in the respective amounts of $2,516.89 and $2,198.79 were duly assessed and paid to said Collector of Internal Revenue.

"3. Thereafter, and on August 31, 1939, the Commissioner of Internal Revenue sent to plaintiff a notice of proposed deficiency informing plaintiff that he had disallowed credits, which plaintiff claimed for contract restricting the payment of dividends under Section 26(c) (2) of the Revenue Act of 1936, in computation of the surtax on undistributed profits, in the amount of $15,944.19 for the year ended April 30, 1937, and $20,402.50 for the year ended April 30, 1938. The Commissioner determined that as a result of the disallowance plaintiff was liable for deficiencies for each of plaintiff's taxable years ending April 30, 1937, and April 30, 1938, in the respective amounts of $3,412.95 and $2,933.95. The plaintiff within 90 days thereafter filed a petition against the Commissioner of Internal Revenue in the United States Board of Tax Appeals for a redetermination of said deficiencies. In the proceeding before the Board of Tax Appeals, being docket No. 100342, on September 15, 1941, counsel for petitioner therein and counsel for the respondent therein entered into a stipulation of settlement whereby the parties agreed that there were deficiencies in income taxes due from this plaintiff for the taxable years ending April 30, 1937, and April 30, 1938, in the respective amounts of $1,706.48 and $1,466.98. On September 19, 1941, pursuant to such stipulation the Board of Tax Appeals entered a decision determining deficiencies in the stipulated amounts. These deficiencies in income taxes totaling $3,173.46, together with interest accrued thereon as provided by law in the amount of $723.29, were assessed and paid by plaintiff to the Collector of Internal Revenue at Detroit, Michigan, on November 4, 1941.

"The allegations set forth in the petition filed with the Board of Tax Appeals to show a contract restricting payment of dividends during 1937 and 1938 were substantially the same as those contained in Paragraphs 7 through 17 of this stipulation.

"The deficiencies set forth in the decision of the Board of Tax Appeals result from the allowance of credits under Section 26(c) (2) of the Revenue Act of 1936, theoretically computed as follows:

"Fiscal year ended April 30, 1937 $6,664.28
"Fiscal year ended April 30, 1938 $6,499.38

"4. Thereafter, and on July 7, 1943, plaintiff filed with the Collector of Internal Revenue at Detroit, Michigan, claims stated to be under Section 501(c) of the Revenue Act of 1942, requesting a refund of the amounts which plaintiff had paid on November 4, 1941, to the Collector of Internal Revenue in settlement of the deficiencies as aforesaid. Copies of such claims are attached hereto as Exhibits 'A' and 'B'.

"5. Since the filing of said claims and up to the commencement of this suit on July 31, 1944, more than six months elapsed and the Commissioner of Internal Revenue made no decision on such claims. Under date August 2, 1944, plaintiff received from the office of Commissioner of Internal Revenue notice of disallowance in full of its claims for refund, which notice is attached hereto and identified as Exhibit 'C'.

"6. At the close of the plaintiff's fiscal taxable year ending April 30, 1936, the plaintiff's surplus account stood as follows: Surplus deficit—$15,216.63.

"For the fiscal year ending April 30, 1937, after deducting for the normal income and declared value excess profits taxes due, plaintiff had remaining as undistributed net earnings the sum of $19,159.-33. When this sum is offset against the deficit in the surplus account of $15,216.63 which was there at the beginning of the year, there results a surplus of $3,942.70 at April 30, 1937.

"For the taxpayer's fiscal year ending April 30, 1938, after deducting for normal income and declared value excess profits taxes due, plaintiff had remaining as undistributed net earnings the sum of $17,-484.23.

"Immediately prior to March 22, 1933, plaintiff's outstanding capital stock consisted of 5,000 shares of the par value of $100 each and there was no other class of stock. On May 1, 1932, there had been an accrued deficit in plaintiff's surplus account of $34,990.95, and during the fiscal year ending April 30, 1933, plaintiff had a net loss of $31,899.46. On March 22, 1933, the sum of $54,071.65 was credited to plaintiff's surplus account, after reduction of the par value of its outstanding capital stock in a manner permitted by law from 5,000 shares of the par value of $100 each to 5,000 shares of the par value of $10 each, by debiting its capital account in the amount of $54,071.65. A further sum of $45,000 was credited to plaintiff's surplus account June 28, 1934, after change of its outstanding capital stock from 5,000 shares of the par value of $10 each to stock without par value having a stated value of $1 per share, by debiting its capital account in the amount of $45,000. Together, these transactions resulted in a reduction of the capital account and increase (or reduction of deficit) in the surplus account of $99,071.65. If these amounts, previously transferred from capital to surplus account, should be taken out of the surplus account, there would result a deficit on each of the dates April 30, 1936, and April 30, 1937, measured by reducing the surplus account figures set forth above by $99,071.65, i. e., a deficit of $114,288.28 and $95,128.95 respectively.

"7. Under date November 1, 1929, plaintiff had executed a first mortgage trust indenture securing an issue of its bonds in the principal amount of $200,000 maturing November 1, 1959 and bearing interest at the rate of $6\frac{1}{2}\%$ per annum.

"8. Plaintiff defaulted in the payment of the semi-annual interest falling due. November 1, 1932. An agreement entitled 'Deposit Agreement' was executed under date March 22, 1933, between plaintiff and the members of a bondholders protective committee to which individual bondholders could become parties by depositing their bonds with designated depositaries.

"9. Said Deposit Agreement contained the following provisions:

"a. Part I, Section 4:

"'For the purpose of providing for the retirement of bonds prior to their specified maturity, the Company agrees to deposit with one or both of the Trustees as shall be provided for in the First Supplemental Indenture, on or before each November 1 hereafter so long as more than $100,000 in aggregate principal amount of bonds are outstanding and unpaid, such sum from the net earnings of the Company, for the 12 months period ending on the preceding April 30, after all postponed interest shall

have been paid or an amount for the payment thereof set apart, as shall be determined by the Committee in its uncontrolled discretion. The Committee shall have the right, in its uncontrolled discretion, to fix any particular sinking fund payment during said period at an amount equivalent to all of said net earnings or equivalent to any part thereof or, irrespective of net earnings for the 12 months ending on the preceding April 30, may waive any particular sinking fund payment if, in the opinion of the Committee, such net earnings should be applied to the cost of operating, repairing or maintaining the mortgaged property, or for other capital expenditures and/or for working capital, but for no other reason. All sinking fund payments shall be used by the Trustees or one of them for the purchase of bonds in the open market, preference to be given to bonds offered at the most favorable prices. All bonds so purchased shall be surrendered to one of the Trustees for cancellation and thereafter duly cancelled. Any of such sinking fund payments not so applied to the purchase of bonds within a period of 120 days after the payment thereof to the Trustees or one of them, shall be applied to the redemption of bonds on the next date on which redemption can be made under the terms of the Indenture. From and after the time when there shall be outstanding and unpaid under the Indenture not to exceed $100,000 in aggregate principal amount of bonds, said annual sinking fund payments for the purposes aforesaid shall be an amount equivalent to 25% of the net earnings of the Company.'

"b. Part I, Section 5:

" 'Net earnings for the purpose of determining the amount of any annual sinking fund payment (subject to the right of the Committee to waive or reduce any particular sinking fund payment so long as more than $100,000 in principal amount of bonds are outstanding and unpaid) shall be deemed to mean gross earnings of the Company less usual and customary expenses reasonably incurred in the operation of the business of the Company, including maintenance, insurance, taxes and interest, but before depreciation.'

"10. Thereafter, pursuant to the authority and power conferred by the Deposit Agreement, an amended trust indenture was executed on December 27, 1934, between the plaintiff and the trustees of the mortgage trust indenture, but was dated November 1, 1932, and said amended trust indenture was entitled 'First Supplemental Indenture.'

"11. Said First Supplemental Indenture contained the following provisions:

"a. Article II, Section 1:

" 'A sinking fund is hereby established for the purpose of retiring stamped bonds prior to their specified maturity. The Company shall deposit with the Corporate Trustee on or before each November 1 hereafter, commencing with November 1, 1933, so long as more than $100,000 in principal amount of bonds are outstanding and unpaid, a sum equivalent to the net earnings of the Company for the 12 months' period ending on the preceding April 30, as hereinafter more clearly defined, after all postponed interest as hereinbefore referred to in Article I shall have been paid. If the Company shall fail to make all or any part of such payment and there shall be deposited with the Corporate Trustee a statement in writing, signed by the chairman or a majority of the members of the Committee as constituted at that time, that the unpaid part of such sum has been waived by the Committee, and/or otherwise expended under and by direction of the Committee, as provided in Section IV of Part I of Exhibit A, then the failure of the Company to make such payment shall not be deemed an event of default or give rise to the application of remedies provided for in Article V of the Indenture, as amended and supplemented by this Agreement.

" 'From and after the time when there shall be outstanding and unpaid under the Indenture and this Agreement not in excess of $100,000 in aggregate principal amount of bonds, the Company shall deposit on each November 1 thereafter with the Trustee an amount equivalent to 25% of the net earnings of the Company which shall be applied by the Corporate Trustee to the retirement of bonds as hereinafter provided.'

864

"b. Article II, Section 2:

" 'Net earnings for the purpose of determining the amount of any annual sinking fund payment shall be deemed to mean gross earnings of the Company less usual and customary expenses reasonably incurred in the operation of the business of the Company, including maintenance, insurance, taxes, interest, and expenses of the Committee, but before depreciation.'

"c. Article II, Section 3:

" 'As soon as reasonably applicable after the receipt thereof, but in any event on or before four months after November 1 in any year, commencing with November 1, 1933, all moneys paid to the Corporate Trustee as a part of the sinking fund shall be applied by the Corporate Trustee in the event said moneys are in excess of $2,000 to the purchase of outstanding stamped bonds in the open market at such price or prices as shall be determined by the Corporate Trustee, but not exceeding the par value thereof, preference to be given to stamped bonds offered at the most favorable price.

" 'Any sinking fund moneys not so applied within such period, if in excess of $2,000, shall be applied to the redemption of stamped bonds in the manner set forth in Article III of the Indenture as amended and supplemented by this Agreement on the next date upon which redemption can be made. For the purpose of redeeming extended bonds with sinking fund moneys, the Corporate Trustee may, in its own name or in the name of the Company give all necessary notices and exercise the power of redemption conferred upon the Company by the Indenture.'

"d. Article II, Section 5:

" 'All bonds purchased or redeemed by the application of the sinking fund moneys, together with all unmatured coupons appertaining thereto, shall immediately be canceled and delivered to the Company and no bond or bonds shall be issued in place thereof.'

"12. As a part of the plan pursuant to which the Deposit Agreement and First Supplemental Indenture were executed, and before the execution of the Supplemental Indenture, a voting trust was created and all of the common stock of plaintiff was deposited with Herbert O. Joynt, Julius L. Beers and Arthur T. Leonard as voting trustees with power to elect the board of directors of the plaintiff. Said Herbert O. Joynt and Julius L. Beers and Edward H. Taylor, Wendell C. Griffith and Harold Townsend were elected directors pursuant to the Voting Trust Agreement and held office during the entire of the plaintiff's fiscal years ending April 30, 1937, and April 30, 1938. Said Joynt, Beers and Taylor were the members of the Bondholders Protective Committee acting in the bondholders' behalf pursuant to the terms of the Deposit Agreement. On July 25, 1933, the Public Trust Commission created by Act 89 of the Public Acts of Michigan of 1933 approved the plan pursuant to which the Deposit Agreement and voting trust were created and granted a license to the Bondholders Protective Committee authorizing the members thereof 'to act as a Bondholder's Protective Committee in this State according to the terms of said Act until June 30, 1934, or until said license is revoked by order of this Commission.' Thereafter by annual renewals of such license the Bondholders Protective Committee continued to act under license from the Public Trust Commission subject to the provisions of the Act, as amended, until after April 30, 1939. On December 13, 1934, the Public Trust Commission approved the First Supplemental Indenture.

"13. During each of its fiscal years ending April 30, 1937, and April 30, 1938, there were outstanding and unpaid more than $100,000 in aggregate principal amount of plaintiff's bonds secured by the aforesaid first mortgage trust indenture as amended by the aforesaid First Supplemental Indenture.

"14. The plaintiff made the following payments into the sinking fund during its fiscal year ending April 30, 1937, viz.:

"October 19, 1936 — $15,000
"November 13, 1936 — 1,400

"Total $16,400

"15. During its fiscal year ending April 30, 1937, the Trustee used and applied the sum of $15,944.19 of the $16,400 paid into the sinking fund in the purchase

and discharge of plaintiff's aforesaid bonds.

"16. On October 19, 1937, the plaintiff paid into the sinking fund the sum of $20,000.

"17. During its fiscal year ending April 30, 1938, the Trustee used and applied the sum of $20,402.50 in the purchase and discharge of plaintiff's aforesaid bonds, said sum being made up of the $20,000 paid into the sinking fund by plaintiff on October 19, 1937, and a balance remaining in said sinking fund from the previous year.

"18. For its fiscal year ending April 30, 1937, plaintiff's net income amounted to $22,590.86, and for its fiscal year ending April 30, 1938, $19,904.88.

"19. Plaintiff's adjusted net income for the taxable year ending April 30, 1937, within the meaning of Section 14 of the Revenue Act of 1936, was $19,159.33 and its adjusted net income for the taxable year ending April 30, 1938, within the meaning of said Section 14, was $17,484.-23."

The surtax deficiencies in question were based on section 14 of the Revenue Act of 1936, 49 Stat. 1648, 1655, 26 U.S.C.A. Int. Rev.Acts, page 823,[1] which imposed a surtax on corporate net income earned during the tax year but not distributed as dividends, and section 26(c) (2) of that Act, 49 Stat. 1648, 1664, 26 U.S.C.A.Int.Rev. Acts, page 836,[2] which allowed a credit to corporations which were parties to contracts restricting the disposition of earnings and profits. However, subsequent to the assessment and payment of these surtax deficiencies and interest thereon, section 26(c) (3) of the Revenue Act of 1936 was amended by section 501(a) of the Revenue Act of 1942, 56 Stat. 798, 954, 26 U.S.C.A.Int.Rev.Acts, page 344, effective as of the date of the enactment of the Revenue Act of 1936, so as to authorize a credit in the case of deficit corporations. The effect of this amendment was to give retroactive relief from the surtax on undistributed profits imposed by the 1936 Act, to deficit corporations which had become subject to that tax because they were prohibited from paying dividends by law or by an order of a public regulatory body. The present suit is based on section 26 (c), as amended by the 1942 Act, which provides in part as follows:

"Sec. 26. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * *

"(c) Restrictions on payment of dividends. * * *

"(3) Deficit corporations. In the case of a corporation having a deficit in accumulated earnings and profits as of the close of the preceding taxable year, the amount of such deficit, if the corporation

---

[1] "Sec. 14. Surtax on Undistributed Profits

"(a) Definitions. As used in this title—

"(1) The term 'adjusted net income' means the net income minus the sum of— * * *

"(2) The term 'undistributed net income' means the adjusted net income minus the sum of the dividends paid credit provided in section 27 and the credit provided in section 26 (c), relating to contracts restricting dividends.

"(b) Imposition of Tax. There shall be levied, collected, and paid for each taxable year upon the net income of every corporation a surtax equal to the sum of the following, subject to the application of the specific credit as provided in subsection (c)."

[2] "Sec. 26. Credits of Corporations

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * *

"(c) Contracts Restricting Payment of Dividends. * * *

"(2) Disposition of profits of taxable year. An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word 'debt' does not include a debt incurred after April 30, 1936."

is prohibited by a provision of a law or of an order of a public regulatory body from paying dividends during the existence of a deficit in accumulated earnings and profits, and if such provision was in effect prior to May 1, 1936.

"(4) Double credit not allowed. If more than one of the credits provided in the foregoing paragraphs (1), (2), and (3) apply, then the paragraph which allows the greatest credit shall be applied; and, if the credit allowable under each paragraph is the same, only one of such paragraphs shall be applied."

The leading case interpreting section 26(c) (3) and tracing its history is United States v. Ogilvie Hardware Co., Inc., 330 U.S. 709, 67 S.Ct. 997, 91 L.Ed. 1192. In that case the Supreme Court stated in 330 U.S. at page 717, 67 S.Ct. at page 1001, 91 L.Ed. 1192, that in enacting section 26 (c) (3) the Congress intended to provide refunds to corporate taxpayers "who had paid undistributed profits taxes as a choice between conflicting state and federal compulsions." The court further said: "We think Congress was moved to relieve those corporations which it considered to be 'caught in a trap' whereby they were taxed by the Federal Government if they did not pay dividends and subject to prosecution and penalties by the Federal Government or the states if they did."

In the stipulation of facts it is stated that plaintiff's adjusted net income for its 1937 taxable year was $19,159.33 and that its adjusted net income for its 1938 taxable year was $17,484.23. Although the parties are in disagreement as to the amount of plaintiff's deficit in accumulated earnings and profits at the close of its 1936 and 1937 taxable years, defendant contends that the existence or extent of such deficits is immaterial, on the theory that under the law of the State of Michigan a corporation may pay dividends out of annual or current net earnings, notwithstanding prior deficits. In other words, defendant claims that plaintiff was subject to the undistributed profits tax on the full amount of the above-stated annual or current adjusted net earnings, notwithstanding any prior deficit it may have had. On the other hand, plaintiff disputes this contention and claims that under the Michigan law a corporation may not pay dividends during the existence of a deficit or an impairment of capital. If defendant is correct in its contention and its interpretation of the Michigan law, the extent of plaintiff's deficit at the close of its 1936 and 1937 taxable years becomes immaterial. Therefore, the court must first determine the Michigan law relative to the payment of dividends. Section 48 of the Michigan General Corporation Act, Act No. 327, Pub.Acts Mich.1931, and sections 22 and 23 of that Act, as amended by Act No. 194, Pub.Acts Mich.1935, Comp.Laws Supp.1940, §§ 10135-22, 10135-23, 10135-48, Stat.Ann. §§ 21.22, 21.23, 21.48, which authorized and governed the payment of dividends during the years here in question, provided in part as follows:

"Sec. 22. The directors of every corporation formed or existing under this act, subject to any restrictions contained in its articles, shall have power to declare and pay dividends upon the shares of its capital stock either from earned surplus or from net earnings. In determining earned surplus appreciation of value of the assets of the corporation shall not be included until realized: Provided, That appreciation of value shall not be construed to include any increases which result from readjustment of previous reductions of value to correctly reflect the accounts of the corporation at the time of such determination of earned surplus. In determining what is earned surplus the judgment of the board of directors shall be conclusive unless it shall be shown that the directors acted in bad faith or were grossly negligent.

"Nothing in this section contained shall prevent a corporation from declaring and paying dividends upon its preferred stock from any surplus: Provided, That if such dividend shall be declared and paid from any surplus other than earned surplus the shareholders receiving the same shall be advised of that fact at the time of payment to them."

"Sec. 23. No corporation formed or existing under this act, nor the directors thereof, shall pay or authorize the payment of dividends upon any shares of the capi-

tal stock of the corporation except in accordance with the provisions of this act."

"Sec. 48. The directors of a corporation shall not declare or pay dividends or authorize the withdrawal or distribution of any part of its assets except as authorized in this act. * * * In case of any wilful or negligent violation of the provisions of section twenty-two or twenty-three of this act or of this section, the directors * * * shall be jointly and severally liable * * * to the corporation for the full amount of any such dividend, withdrawal or distribution so unlawfully paid."

These provisions of the Michigan General Corporation Act clearly authorize a corporation to pay dividends from either of two sources: (1) earned surplus, or (2) net earnings.[3] However, "net earnings" are not defined in the statute. Nor have the Michigan courts interpreted that term as used in the statute. Plaintiff claims that the term "net earnings" as used therein means accumulated net earnings, that is, the net earnings of the corporation from its inception and, therefore, that a corporation may not pay dividends during the existence of a deficit in accumulated net earnings or an impairment of its capital. On the other hand, defendant claims that the term "net earnings" means current or annual net earnings, and that as the terms "earned surplus" and "net earnings" are stated in the statute in the alternative, a corporation may pay dividends out of its current or annual net earnings for any year, although it had no earned surplus and although it had an actual deficit in accumulated net earnings or an impaired capital.

Webster's New International Dictionary (2d Ed.) defines "net earnings" as: "Excess of earnings over expenses, sometimes including interest charges, during a given period." In Union Pac. R. Co. v. United States, 99 U.S. 402, 420, 426, 25 L.Ed. 274, the court said:

"As a general proposition, net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the ex-

penditure of capital laid out in constructing and equipping the works themselves. * * *

"Each year is to stand by itself. If there is a deficit in any year instead of net earnings, such deficit cannot be carried over into the next year's accounts by the company."

In Mobile & O. R. Co. v. Tennessee, 153 U.S. 486, 497, 14 S.Ct. 968, 972, 38 L.Ed. 793, the court said: "The net earnings of corporations out of which profits are distributable in dividends are thus defined in St. John v. [Erie] Railway Co., 10 Blatchf. [271], 279, Fed.Cas.No.12,226: 'Net earnings are properly the gross receipts less the expenses of operating the road to earn such receipts. Interest on debts is paid out of what thus remains that is, out of the net earnings. Many other liabilities are paid out of the net earnings. When all liabilities are paid, either out of the gross receipts or out of the net earnings, the remainder is the profit of the shareholders, to go toward dividends, which, in that way, are paid out of the net earnings.' "

The term "net earnings" has been given similar content in the State courts. In State ex rel. St. Charles St. R. Co. v. Board of Assessors, 48 La. 1156, 1159, 20 So. 670, 671, the court stated: " 'Net earnings' are defined, substantially, in Union Pac. R. Co. v. United States * * * as the surplus of the transportation earnings above operating expenses. The phrase has also been defined, in a general way, as the excess of the gross earnings over the expenditures in producing them, less the expenditure of capital laid out in constructing and equipping the road. Under each definition, each year stands by itself. We do not think that they cover, as an amount to be deducted from the gross receipts, an indebtedness of a prior year."

In Cotting v. New York & N. E. R. Co., 54 Conn. 156, 168, 5 A. 851, 853, the court stated: "The term 'net earnings' may be and often is the equivalent of surplus or net profits; but we think it is not used in that sense here. As we have noticed, it is net earnings for a limited time, and not the

---

[3] It may be noted that under the second paragraph of section 22, dividends may be paid on preferred stock from any surplus.

net earnings for the whole period of time the corporation has existed. The latter may properly be called surplus or profits. To ascertain the surplus on the thirty-first day of March, 1886, the state of the whole account must be considered, including, of course, the amount charged to profit and loss prior to October 1, 1885; but, to ascertain the net earnings for the six months ending March 31st, it is only necessary to deduct from the gross earnings the operating expenses for that time, including repairs and a proportional part of the fixed charges."[4]

█ In pursuance of the foregoing authorities the court interprets the language of section 22 of the Michigan General Corporation Act, which empowers the directors of a corporation to declare and pay dividends "either from earned surplus or from net earnings," to mean that there are two exclusive and alternative sources from which dividends may be paid. As "net earnings" are distinct and separate from "earned surplus," and as either may exist in any given period with or without the other, a corporation's net earnings for any taxable year would be a legitimate source of dividends irrespective of its earned surplus. It should be noted that the rights of corporate creditors are not involved in the present suit; nor is there any question of corporate insolvency. Under such circumstances the plaintiff could lawfully declare and pay dividends from its current net earnings for each taxable year even though it had no earned surplus and even though it had an actual deficit. Plaintiff's contention that the term "net earnings" means accumulated net earnings and, therefore, that a corporation may not pay dividends during the existence of a deficit in accumulated net earnings or an impair-

ment of capital, is based on the theory that general concepts of corporation law preclude payment of dividends from current earnings in the face of a capital impairment. The short answer to that contention is that in the present case we are dealing with a specific statutory provision and not with general concepts of corporation law. It is also significant that there is no provision in the Michigan General Corporation Act requiring an excess of assets over liabilities and capital as a condition precedent to the payment of dividends, and no provision prohibiting an impairment of capital by the payment of dividends.

In the standard treatise on Michigan corporation law, Wilgus and Hamilton, Michigan General Corporation Act (1932 Ed.) pp. 209–210, the authors, who were both members of the committee which drafted the Michigan General Corporation Act, make the following comment on section 22 of the Act: "Our Statute in this Sec. 22, recognizes two sources for the payment of dividends: 1. Surplus, or 2. Net earnings; the various kinds and sources of 'surplus' are defined in Sec. 20, and the notes thereto; but 'net earnings' are not defined in the statute; the note to Sec. 20, shows that in some cases 'net earnings' are defined as equivalent to 'surplus' as usually defined, although the more usual definition is excess of current gross earnings over current operating expenses, or in some cases as the accumulations of such from year to year that have not been paid out as dividends appropriated to some other corporate purpose; this section puts it in the alternative 'surplus' or 'net earnings' from which it seems a fair conclusion that these terms are not used as equivalent in meaning. If this is correct, then the section authorizes the declaration of divi-

[4] Defendant also cites the following treatises, in addition to interpretations made by the courts, as clearly indicating that the term "net earnings" is ordinarily used to refer to the earnings of a particular period, such as a single year, rather than to an accumulation or balance dating from the original capitalization: Stevens, Handbook on the Law of Private Corporations (1936) 391–393; Kehl, Corporate Dividends (1941) pp. 66–68; Ballantine and Hills, Corporate Capital and Restrictions Upon Dividends Under Modern Corporation Laws, 23 Cal.L.Rev. 229, 241 (1935); James, The New Michigan Corporation Act, 11 Michigan State Bar Journal (1931) 187, 191; Guthman, Analysis of Financial Statements (1942) p. 199; 1 Dewing, Financial Policy of Corporations (4th Ed.) (1941) p. 653, 665, passim; Bienvenu, Accounting and Business Dictionary (1940) 178; Kilduff, Auditing and Accounting Handbook (1924) 146.

dends: * * * on all stock, preferred and common, from 'net earnings,' current or accumulated probably, and apparently without any reference as to whether the assets exceed the liabilities plus the outstanding capital stock, fixed or circulating. In other words, the statute authorizes either the 'Balance Sheet,' or the 'Revenue Account' method of determining profits available for dividends, neither being dependent upon the other. If this is correct, then the statute goes further than the Delaware law, or the English law. It will be for the courts to determine whether this shall be interpreted as being subject to or limited by the 'trust fund doctrine' for the protection of creditors, or the adjustments of the rights of various classes of shareholders among themselves." [5]

It may also be noted that section 22 of the Michigan General Corporation Act was amended in 1943 by Act No. 160, Pub. Acts Mich.1943, Comp.Laws Supp.1945, § 10135-22.[6] This amendment to section 22 is not involved in the present suit, but it is significant that the amendment eliminated "net earnings" as a source of dividends and provided that dividends could be paid only from "earned surplus." In a note explaining the purpose of the amendment (Wilgus and Hamilton, supra, 1945 cum. supp. p. viii), the chairman of the committee which drafted it stated: "Section 22, relating to source of dividend payments, restricts the payment thereof from earned surplus only, eliminating the former provision that they might be paid from either earned surplus or net earnings. This is for the purpose of prohibiting the payment, by some corporations which have no surplus, or have even an impairment of capital, of dividends from current net earnings."

Subsequent to the hearing and the filing of briefs in the present case, the United States Court of Appeals, Fourth Circuit, rendered its opinion in United States v. Riely, 169 F.2d 542. That case involved the identical question presented in the case at bar except as to the slight difference between the Virginia and Michigan statutes relative to payment of dividends. Section 3840 of the Virginia Code provided that the directors of a corporation had power to declare and pay dividends "out of net earnings, or out of its net assets in excess of its capital." The District Court had interpreted this provision to mean that a corporation could not pay dividends from current net earnings while it had a deficit or an impaired capital. Riely v. United States, 1947, D.C.Va., 77 F.Supp. 273. In reversing the District Court, Judge Dobie said:

"The only question, then, that we are called upon to decide is whether or not, by this Virginia Statute, the taxpayer-corporation was prohibited from paying dividends from its net earnings of $86,412.46 for the year 1937, when these earnings were far from sufficient to restore its capital deficit. No Virginia case has been found interpreting or applying the instant provision of the Virginia Statute. The District Judge interpreted the Statute as prohibiting the declaration of dividends for the year 1937 and granted the refund sought by the taxpayer. In this, we think, he erred.

"At the outset, it should be noted that no question of corporate insolvency is here involved and that corporate creditors play no part in the problem. * * *

"If a pure analytical approach be employed, clearly there was here no prohibition of the declaration of dividends. The Statute is couched, not in the terms of a negative prohibition, but rather in the terms of positive authorization. Directors of a corporation are empowered to declare and pay dividends 'out of net earnings, or out of its net assets in excess of its capital.' Manifestly, net earnings (on the one hand) and excess of assets over capital (on the other hand) are utterly and absolutely

---

[5] It should be noted that the authors' reference to the "trust fund doctrine" is made only in relation to protection of creditors or to the adjustment of shareholders' rights inter sese. No such problem arises in the present suit.

[6] The 1943 amendment provided in part: "The directors of every corpora-

tion formed or existing under this act, subject to any restrictions contained in its articles, shall have power to declare and pay dividends upon the shares of its capital stock from earned surplus except as hereinafter provided."

distinct and separate. Either may exist, or not exist, as to a specified period, with, or without, the other.

"The words 'net earnings' are followed by a comma; then, before the words 'out of its net assets in excess of its capital' comes the disjunctive conjunction 'or'. As the English language is rationally used, this would seem to imply two separate sources of dividends ((1) net earnings; and (2) excess of assets over capital), each with no relation to, no connection with, the other. To arrive at the interpretation reached by the District Judge, it is necessary to insert in the Statute, right after the words 'net earnings' some such non-existent negative proviso as 'provided there is an excess of corporate assets over capital.' If such were the real intention of the statutory draftsman, he must plead guilty to the charge of hideously inept draftsmanship. * * *

"Counsel for appellees insist that general concepts of corporation law preclude payment of dividends from current earnings in the face of a capital impairment, failing explicit statutory provision therefor. And we are cited to 29 Col.L.R. 906, 909; 11 Fletcher, Cyclopedia of Corporations, p. 838. Of course, whatever conclusion we reach as to the usual corporate practice in the absence of statute is not conclusive here; for we are dealing with the meaning of the express words used in the specific Virginia Statute.

"Let us suppose, however, that (absent any statute) a corporation starts with a capital of $100,000. After several difficult years, the corporate assets are reduced to $90,000. There are no creditors and there is ample cash to carry on the corporate business. Now comes a good year in which the corporation's net earnings are $5,000. We believe that if the directors in their sound discretion so determine, there is no compelling reason in corporate finance or economic practice, which would prevent the directors from declaring a $5,000 dividend for the stockholders. Surely this would not constitute a very unusual performance."

Although the wording of the Virginia statute differs from that of the Michigan statute, it is evident that the statutes are identical in principle. This the present plaintiff recognized when he cited the opinion of the district court as authority for its position. Whereas the Michigan statute permits the payment of dividends from net earnings or from earned surplus, the Virginia statute permits the payment of dividends from net earnings or from net assets in excess of capital. Indeed, the United States Supreme Court has defined earned surplus as "the net assets of a corporation in excess of all liabilities including its capital stock * * * where it (the surplus) was derived wholly from undistributed profits." Edwards v. Douglas, 269 U.S. 204, 214, 46 S.Ct. 85, 70 L.Ed. 235. In both the Riely Case and the present case the taxpayers contended that the statutory provisions involved prohibited the payment of dividends in the face of a capital impairment. This contention was rejected by the appellate court in the Riely Case and it is rejected in the present case.

The court concludes that Michigan law did not prohibit plaintiff from paying dividends during the years in question. The court is aware that the decision in Senior Investment Co. v. Commissioner, 2 T.C. 124, is contrary to this conclusion but is unable, as was Judge Dobie in United States v. Riely, supra, to agree with the Tax Court's reasoning in that case.

Plaintiff further claims that it is entitled to relief under the provisions of section 26(c) (3), which grants a deficit credit to corporations which were prohibited from paying dividends during the existence of a deficit by a provision of an order of a public regulatory body. However, defendant questions plaintiff's right to assert this additional ground for relief, because plaintiff's claim for refund did not fully apprise the commissioner that it would rely on that ground. Assuming, but without deciding, that plaintiff's claim for refund was in proper form, the court concludes that this further claim for relief is without merit. Section 26(c) (3), hereinbefore quoted, provides that a corporation which had a deficit in accumulated earnings and profits as of the close of the preceding taxable year, shall be allowed credit for the amount of such deficit if it was "prohibited

by a provision * * * of an order of a public regulatory body from paying dividends during the existence of a deficit in accumulated earnings and profits, and if such provision was in effect prior to May 1, 1936." Plaintiff claims the benefit of this provision by reason of the fact that during its 1937 and 1938 taxable years it was operating under an agreement with a bondholders' protective committee,[7] which was licensed by the Michigan Public Trust Commission.[8] In pursuance of this agreement plaintiff paid substantially all of its net earnings for those years into a sinking fund for the retirement of its bonds. However, section 26(c) (3) clearly states that a deficit corporation may receive credit for the amount of its deficit only in case it was prohibited from paying dividends during the existence of the deficit by a provision of an order of a public regulatory body. In the present case there is no evidence of any order of a public regulatory body prohibiting plaintiff from paying dividends during its 1937 and 1938 taxable years. The Michigan Public Trust Commission made no such order. The bondholders' protective committee was not a public regulatory body within the meaning of that term as used in section 26(c) (3). The provisions of the agreement or arrangement with the bondholders' protective committee relating to the payment of defaulted bonds did not constitute an order of the commission merely because the commission had originally licensed the committee and approved its activities. Even though the action of the commission were construed as an order prohibiting plaintiff from paying dividends, it would not be a prohibition against payment of dividends during the existence of a deficit in accumulated earnings and profits, as required by said section. Furthermore, although plaintiff may have been prohibited from paying dividends by its contract with the bondholders' protective committee, this is the type of prohibition contemplated by section 26(c) (2),[9] for which plaintiff has already received credits for the taxable years here in question.

(See paragraphs 2 and 3 of stipulation of facts.) Plaintiff was not prohibited from paying dividends during its 1937 and 1938 taxable years by a provision of an order of a public regulatory body.

In accordance with this opinion judgment of no cause of action will be entered for defendant.

---

[7] See stipulation of facts, paragraphs 7 to 17, inclusive.

[8] Act No. 89, Pub.Acts Mich.1933, Comp.Laws Supp.1940, § 290-1 et seq., Stat.Ann. § 27.1291 et seq.

[9] This section is quoted in footnote 2.