WIER LONG LEAF LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6223. Promulgated November 28, 1947.

*Thomas J. Reilly, Esq., J. A. Phillips, Esq., Milton H. West, Jr., Esq.,* and *Harry R. Jones, Esq.,* for the petitioner.
*Frank B. Schlosser, Esq.,* for the respondent.

994

OPINION.

HARLAN, *Judge*: Prior to the change in the 1942 Act [1] with reference to the treatment of capital gains by corporations, it made no difference

---

[1] Sec. 150, Revenue Act of 1942, amending sec. 117, I. R. C.

to a corporation whether the current depreciation up to the date of the sale or other disposition of an asset was allowed or disallowed. If allowed, it reduced the basis and if disallowed the basis would be increased. The profit in either event would be the same and taxable as ordinary income. The 1942 Act provides for two classes of income for corporations, ordinary income and capital gain. Because of the lower rate of tax on capital gains the treatment to be accorded the current year's depreciation becomes important and accounts for the resistance to respondent's determination in this proceeding that petitioner is not entitled to any depreciation on its sawmill and mill equipment for the year 1942.

We are not able to conclude that petitioner has met its burden of proof and demonstrated that respondent's determination with respect to the depreciation deductions claimed on its mill was erroneous. *Potter Farms, Inc.*, 6 B. T. A. 110.

In the present taxable year petitioner had all of the facts before it upon which it could compute an accurate amount to be deducted by it as its depreciation allowance for that year. In order to arrive at the correct amount, i. e., the "reasonable allowance" under the statute, it had only to adjust the annual deduction which it proposed to take for the instant year by comparing its basis for the property with the total deductions previously taken and the currently ascertained correct salvage value. It has long been the rule that depreciation deductions are to be corrected in any year when it is apparent that the factor involving the extent of useful life is erroneous.[2] (see e. g., *Washburn Wire Co.* v. *Commissioner* (C. C. A., 1st Cir.), 67 Fed. (2d) 658), and that the reasonableness of a deduction for depreciation is to be determined upon conditions known to exist at the end of the period for which the return is made. Regulations 111, sec. 29.23 (1)–5. See *Commissioner* v. *Mutual Fertilizer Co.* (C. C. A., 5th Cir.), 159 Fed. (2d) 470. An adjustment to correct for mistaken salvage value is no different from an adjustment of a mistaken estimate of years of use. In this manner depreciation can be kept to an accurate provision for the return of petitioner's capital investment in the property. This is what the law contemplates. See *Helvering* v. *Virginian Hotel Corporation*, 319 U. S. 523.

While it is true that depreciation is not to be adjusted for appreciation in value, that problem generally is concerned with basis.[3] Here we are called upon to resolve the question of what is a reasonable allowance for depreciation in 1942. The burden of showing that the

---

[2] Petitioner, from time to time, has applied this principle when new estimates were made of its uncut timber, even to the extent of including in 1936 $15,000 for mill salvage value when previous estimates had considered the mill to be without any salvage value. (See page 3 of findings.)

[3] It is true that *Thomas Goggan & Brother*, 45 B. T. A. 218, deals with the question as one of depreciation, but, as we have previously stated, the question was not material prior to the 1942 Revenue Act.

property was not fully depreciated at the beginning of the present tax year, assuming a correct figure for salvage value, has not been met. Indeed, no evidence of the amount which should properly be attributed to anticipated salvage of the mill property under the circumstances then known to exist appears in the record. It thus fails to be apparent that petitioner is entitled to any depreciation whatever and on this issue the respondent's determination must be sustained.

As to the issue of depreciation on the automobiles, a different situation exists. The parties have by their stipulation narrowed the scope of controversy. They present for consideration only the question whether the price received from the sale of the depreciated automobiles precludes any depreciation allowance. Granting that depreciation deductions computed in the first instance upon an assumed salvage value must be adjusted from time to time upon ascertainment of inaccuracies in that assumed value, just as adjustments are required for changes in estimates of anticipated life, see *Washburn Wire Co. v. Commissioner, supra,* that is not the question submitted.

It must be taken as settled that mere appreciation in value due to extraneous causes has no influence on the depreciation allowance, one way or the other. *Even Realty Co.,* 1 B. T. A. 355; *Seton Falls Realty Co.,* 6 B. T. A. 883; *Max Eichenberg,* 16 B. T. A. 1368. The sole fact therefore in any specific situation that a given price is received for articles not fully depreciated throws no light on the effect upon the depreciation allowance. *Thomas Goggan & Bro.,* 45 B. T. A. 218. If a higher price was available for the automobiles because of a miscalculation as to their useful life, a different result would follow from an enhanced sale price due to appreciated values. As the question is posed by the parties, it must be answered in the negative. The depreciation deduction can not be disallowed merely by reason of the price received for the article without consideration of other factors. On this issue, as the parties have submitted it under the stipulation, the determination must consequently be in favor of the petitioners.

### *Excess Profits Credit Carry-Back Issue.*

The basic consideration in determining petitioner's right to an excess profits tax credit carry-back under the provisions of section 710 (c) (3) (A) of the Internal Revenue Code [4] depends upon whether

[4] SEC. 710. IMPOSITION OF TAX.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) Unused Excess Profits Credit Adjustment.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) Amount of Unused Excess Profits Credit Carry-Back and Carry-Over.—

(A) Unused Excess Profits Credit Carry-Back.—If for any taxable year beginning after December 31, 1941, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for each of the two preceding

the word "corporation" as used in the excess profits tax provisions of the code includes liquidating corporations within the purview of the tax credit carry-back section.

Since liquidation of some sort is the destined fate of almost all corporations and is therefore a normal corporate function, it could be soundly argued that, under a general revenue law pertaining to all "taxpayers," liquidating corporations would be included with active corporations unless specifically exempted. Cf. *Will T. Caswell*, 36 B. T. A. 816; *Taylor Oil & Gas Co.* v. *Commissioner*, 47 Fed. (2d) 108; certiorari denied, 283 U. S. 862.

Such was also the recent decision of this Court in *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629. The question discussed and decided in that case was whether or not a liquidating corporation could deduct, under the provisions of section 23 (s)[5] and section 122 (b) (1)[6] of the code, a loss suffered during the two years of liquidation, 1944 and 1945, from the corporation's net taxable income during 1943, its last year of active operation. The Court therein said (p. 640) : "The words of the statute are general in their application and something would have to be read into them which is not there to limit them so that they would not apply in this case."

It is our opinion, however, that the above statement does not apply without qualification to the excess profits tax provisions of the Internal Revenue Code. True, those provisions are general in the sense that they have universal application throughout the United States, but they are special in the sense that they were passed to cover a limited period of time, the war years, and had special objectives in addition to the raising of revenue, i. e., the control of wartime inflation and the facilitation of the return to a peacetime economy.[7]

---

taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such unused excess profits credit over the adjusted excess profits net income for the second preceding taxable year computed for such taxable year (i) by determining the unused excess profits credit adjustment without regard to such unused excess profits credit, and (ii) without the deduction of the specific exemption provided in subsection (b) (1).

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
    In computing net income there shall be allowed as deductions :

    *       *       *       *       *       *       *

    (s) NET OPERATING LOSS DEDUCTION.—For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122.

[6] SEC. 122. NET OPERATING LOSS DEDUCTION.

    *       *       *       *       *       *       *

    (b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—
    (1) NET OPERATING LOSS CARRY-BACK.—If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d), (1), (2), (4), and (6), and (B) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss.

    [7] See sec. 780, I. R. C., providing for post-war refund of excess profits tax.

The loss carry-back provision of section 122 of the code was intended to cover not only all taxpayers within its jurisdiction, but it was to last an indefinite period of time during which it was reasonably to be anticipated that large numbers of corporate taxpayers would liquidate. The failure of Congress to exclude such liquidating corporations from the privilege of loss carry-backs did not conflict with any of the purposes of the peacetime revenue law and in fact carried out those purposes by promoting industrial stability, and by removing peacetime peaks and valleys from taxpayer's revenue.

It was not, however, reasonably to be anticipated in 1942, when section 710 (c) (3) (A) of the code was enacted, that during the feverish activity of a short war period many corporations would liquidate. Furthermore, to permit the carry-back of excess profits tax credits by liquidating corporations so as to refund excess profits taxes already collected would seriously militate against the stability of war revenue and the anti-inflationary and reconversion purposes of the excess profits tax law itself.

Therefore, it is our opinion that any court, in deciding the question of the allowance of the excess profits tax carry-back credit to liquidating corporations, is justified in inquiring whether or not the terms "taxpayer" and "corporation" used in the excess profits tax law provisions included liquidating corporations for the purpose of the carry-back credit. Such inquiry is not for the purpose of reading something into the act "which is not there," but to define the terms "taxpayer" and "corporation" as used in the statute.

Section 710 (c) (3) (A) became a part of the 1942 Act as a Senate amendment. It occasioned no debate and practically no relevant explanation either on the Senate floor or when the Conference Committee Report was before the House. However, the Senate committee which presented the amendment said in its report, Senate Report No. 1631, 1942-2 C. B. 504, 546-547:

> * * * Many corporations will suffer substantially in periods of declining profits, especially at the close of a war economy in which their deductible expenses have been held down to a bare minimum by priorities, rationing, labor shortages, and other factors beyond the control of the taxpayer. For example, a corporation during the war years makes substantial profits which would be considerably reduced if it could make the expenditures possible in a free economy for maintenance, repair, and other deductible expenses. Upon the termination of the war, the materials and labor will once more be available, but the costs and expenses which would otherwise be taken against the wartime profits will fall into the years of lesser profits or of no profits, thereby resulting in small or no tax benefit for the taxpayer.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> To afford relief to *these hardship cases*, where *maintenance and upkeep expenses*, must, because of wartime restrictions be *deferred to peacetime years*, your committee has provided a 2-year carry-back of operating losses and of unused excess-profits credit. [Italics supplied.]

From the above it is certainly obvious that the excess profits tax credit carry-back was intended by Congress to benefit only corporations which had been in active production throughout the war period and which had projected their activities to "peacetime years." The amendment was surely not adopted to permit a corporation during wartime years to cease all productive activity and obtain a substantial profit at the expense of the Federal revenue for doing nothing. Such an interpretation would permit a needless and unreasonable diversion of wartime revenue, would promote inflation, and would not assist reconversion to peacetime economy.

That the petitioner itself evidently realized the unreasonableness of a statutory interpretation which would produce such indefensible results is shown by its failure to make any claim for an excess profits credit carry-back until after the Commissioner had determined a deficiency in its declared value excess profits tax and excess profits tax for 1942. Petitioner then, on October 10, 1944, filed its petition herein, claiming the benefit of the excess profits tax credit carry-back provision. On March 11, 1944, petitioner filed its 1943 income tax return, Form 1120, and reported a declared value excess profits tax and income tax of $1,974.80. Subsequently it paid this amount and made no claim for any overpayment in its 1942 tax. Furthermore, it never set up such a claim on its books.

Petitioner justifies its present contention almost wholly on *Acampo Winery & Distilleries, Inc., supra*. While the opinion in that case refers only to loss carry-backs and does not discuss excess profits tax credit carry-backs, the whole question was before the Court for decision. However, the respondent therein did not present any separate argument against excess profits tax credit carry-backs and both counsel agreed that the two issues should be joined for consideration and decision. Therefore the issue before the Court in the case at bar was neither argued nor decided in the *Acampo* case except to the extent that the argument against the application of loss carry-backs would also apply to excess profits tax credit carry-backs. The *Acampo* case is therefore to be distinguished from the case at bar.

As bearing upon the use by this Court of facts of general knowledge existing at the time of the passage of the excess profits tax credit carry-back law and also the use by this Court of the Senate committee reports above set out for the purpose of interpreting the words "taxpayer" and "corporation," which words would ordinarily have an accepted meaning without interpretation, we may cite a recent decision of the United States Supreme Court, *United States* v. *American Trucking Associations*, 310 U. S. 534, wherein the Court said:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine

the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. *Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." * * * A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, "excepting as a different purpose is plainly shown."* [Italics supplied.]

See also *Tsoi Sim* v. *United States*, 116 Fed. 920; *Church of the Holy Trinity* v. *United States*, 143 U. S. 457; *Ozawa* v. *United States*, 260 U. S. 178; and *United States* v. *Ogilvie Hardware Co.*, 330 U. S. 709.

It is therefore our decision that the petitioner herein is not entitled to the benefit of the excess profits tax credit carry-back during the years 1943 and 1944 when it was a liquidating corporation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

VAN FOSSAN and MURDOCK, *JJ.*, dissent.

————

BLACK, *J.*, dissenting: I dissent from the majority opinion wherein it disallows petitioner any depreciation on its mill properties for the year 1942. Petitioner in its brief states this issue as follows:

Did the respondent err in refusing petitioner the statutory allowance for wear and tear "depreciation" upon its mill properties operated throughout the year up to its sale in December, 1942, because, due to market conditions as a result of the war the price received on its sale exceeded its estimated salvage value, which value had been agreed upon by petitioner and respondent for all years from 1936 through 1941?

I think respondent did so err.

On January 1, 1942, petitioner's sawmill and mill equipment had a remaining depreciated value of $24,768.71, and the estimated lumber remaining to be cut was 21,000,000 feet. Petitioner's estimate of its remaining lumber feet was low, and petitioner in 1942 actually cut in excess of 28,000,000 feet of timber. Petitioner had been cutting approximately 35,000,000 feet of timber per annum. In its tax return for 1942 petitioner deducted the difference between the salvage value of $15,000 and the depreciated value as of January 1, 1942, of $24,-768.71, being the sum of $9,768.71, as a reasonable allowance for wear and tear of its sawmill and mill equipment. Respondent determined that petitioner was entitled to no deduction in 1942 for depreciation of its sawmill and mill equipment.

Respondent's action in disallowing petitioner any depreciation on its mill properties in 1942, notwithstanding petitioner had cut in that year 28,000,000 feet of timber, seems to be based on the fact that due to the war petitioner's mill properties had greatly appreciated in value and were sold at the end of the year for a good profit over the salvage value of $15,000 which had been agreed upon in 1936 between petitioner and the Bureau of Internal Revenue. But the fact that this property had appreciated in value due to war conditions and could be sold at a profit does not, in my opinion, defeat petitioner's right to take depreciation due to the wear and tear of its mill properties in 1942. See *Even Realty Co.*, 1 B. T. A. 355; *Max Eichenberg*, 16 B. T. A. 1368. If petitioner was entitled to take *any* depreciation for the wear and tear of its mill properties in 1942, then the amount of that depreciation has been stipulated. It has been agreed and stipulated that, if the Court should hold that petitioner is entitled to any depreciation on its sawmill and mill equipment for the taxable year 1942, the amount thereof is the sum of $9,768.71.

Petitioner, of course, had to return the gain which resulted to it from the sale of its mill properties in December 1942 as capital gain and pay tax thereon. It has done this and for reasons I have already stated, I think petitioner has treated these transactions in the proper manner and is entitled to take the depreciation which it claims on its mill properties for 1942.

I do not dissent from the majority opinion on the other two issues, but concur therein.

———

LEECH and JOHNSON, *JJ.*, concur in the dissent of Judge Black on the first issue, but also dissent from the decision of the majority on the third issue, since they believe *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629, is not effectively distinguishable.