Pilot Freight Carriers, Inc. v. Commissioner.
Pilot Freight Carriers, Inc. v. Commissioner
Docket No. 53266.
United States Tax Court
T.C. Memo 1956-195; 1956 Tax Ct. Memo LEXIS 100; 15 T.C.M. (CCH) 1027; T.C.M. (RIA) 56195; August 27, 1956
*100 Depreciation deductions. - Average useful life of tractors and trailers used in petitioner's business of common carrier in motor freight transportation determined to be four years and five years, respectively. Issues: Pleadings. - Question raised on brief by respondent as to the correctness of salvage values, not framed as an issue by the pleadings, is not properly presented and will not be considered. Leon L. Rice, Jr., Esq., Box 199, Winston-Salem, N.C., and C. W. Womble, Esq., for the petitioner. Paul J. Weiss, Jr., Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion The respondent *101 determined deficiencies in the petitioner's income tax for the calendar years 1950 and 1951 in the respective amounts of $26,578.16 and $35,051.62. The deficiencies so determined arise principally from the partial disallowance of claimed depreciation deductions, the respondent having determined that rolling stock used in the petitioner's business had a longer useful life than claimed by the petitioner in its returns. Stipulations as to other contested adjustments made by the respondent were filed and are mentioned in the Opinion. Findings of Fact Some of the facts were stipulated and as so stipulated are incorporated herein by this reference. The petitioner is a North Carolina corporation with its principal office at Winston-Salem. Since its incorporation in 1942, the petitioner has been engaged in business as a common carrier in motor freight transportation in interstate and intrastate commerce. The petitioner keeps its books and files its income tax returns on the calendar year basis and on an accrual method of accounting. Its income and profits tax returns for the taxable years 1950 and 1951 were filed with the collector for the district of North Carolina, at Greensboro, *102 North Carolina. In its operations the petitioner uses a large number of gasoline-powered tractors and trailers. At the end of the year 1950 the petitioner maintained and operated terminals in Atlanta, Georgia; Columbia and Greenville, South Carolina; Winston-Salem, Charlotte, Durham, Shelby, and Asheville, North Carolina; Philadelphia, Pennsylvania; Paterson and Hoboken, New Jersey; and Buffalo, New York. At the end of 1951 the petitioner also maintained and operated terminals at Augusta, Georgia; Spartanburg, South Carolina; and Syracuse and Utica, New York. In its northbound shipments the freight carried by the petitioner consists principally of textiles, tobacco products and furniture products. The nature of these commodities requires that the petitioner have trailers which are as nearly water tight as it is possible to have. Water damage is one of the largest expenses in operating the business of the petitioner. A small amount of water entering a loaded trailer can cause substantial damage to a large number of cigarettes or bolts of cloth. There is no insurance to cover water damage resulting from defective equipment. This situation requires that the petitioner use the best *103 equipment possible if it is to stay in business. On all of its line hauls the petitioner uses two drivers on each of its tractor-trailers. The tractors are equipped with sleep cabs in which one man can sleep while the other drives. A driver is permitted by law to drive ten hours per day. Under the twoman arrangement used by the petitioner the hauling equipment of the petitioner can be operated as much as 20 hours a day, rather than 10 hours a day as in the case of a oneman operation. Although the possible daily 20 hours of operation is not always attained, the mileage covered by the equipment in a year's time is much greater than in a oneman operation, and as the equipment is on the road for such long periods of time it is not always available for repairs that otherwise would be made. The petitioner maintains its own repair facilities. In the years 1950 and 1951, following the outbreak of the Korean conflict, the petitioner found it difficult and at times impossible to obtain needed parts to make some of the repairs that it otherwise would have made. The petitioner's drivers are paid on a mileage basis and they have a tendency to drive fast, because driving at high speeds increases *104 their earnings per hour and enables them to complete a trip and get a return trip more quickly. During the years 1950 and 1951 approximately 30 per cent of the total mileage over which the petitioner operated its tractors and trailers was in mountainous terrain. Mountainous terrain adversely affects the life of both tractors and trailers. When a tractor is operated in any gear other than high gear the engine is running more miles than are shown by the speedometer. On an upgrade when an engine is operating in a low gear it is wearing out bearings and gears and consuming gas and oil at a higher rate than when it is operating on level ground, and the increased wear and cost are not represented by the mileage shown on the speedometer. On downgrades the drivers have a tendency to drive as fast as possible which requires braking on the curves with consequent wear on the tires and brakes. The warping and twisting of trailers on steep grades opens cracks and causes leaks in them. The weight of the freight shifts from side to side on curves and because of the necessity of using brakes and shifting gears the freight shifts forward and backward. These factors reduce the life of the equipment, *105 and the more rugged the terrain, the shorter is the life of the equipment. The fact that various drivers operate the petitioner's tractors also results in more wear and tear than would be the case if one person drove the same tractor. The petitioner's operations and type of equipment are affected by changes in state laws which regulate maximum lengths and weights of rolling stock on the highways. About 90 per cent of the petitioner's northsouth shipments traverse the state of Virginia. Around 1948 or 1950 that state permitted an increase of gross trailer weights from 40,000 to 50,000 pounds in the case of tandem-axle trailers. Tandem-axle trailers weigh about 2,500 pounds more than single-axle trailers. The change in the state law prompted the petitioner to change over from single-axle to tandem-axle trailers. In and prior to 1949 the predominant type of tractor used by the petitioner was the conventional kind which had the driver's cab mounted back of the engine. The length of this type of tractor was such that when coupled to a 35 foot trailer the over-all length was about 48 feet. Over-all permissible length permitted by the laws of some of the states in which the petitioner *106 operated was 45 feet. In order to comply therewith, in 1949 the petitioner began to purchase tractors on which the driver's cab was mounted over the engine. This type of tractor was shorter than the conventional type and when coupled to a 35 foot trailer gave an over-all unit length of slightly less than 45 feet. In the years following 1949 practically all of the line haul tractors that were acquired by the petitioner were of the new cab-over-engine type. The useful life of the cab-over-engine type of tractor is shorter than that of the conventional type of tractor. The engine is in more cramped quarters, and as the cab is over the engine, the engine does not operate as coolly as in the conventional type. As the cab tilts in order to permit access to the engine, the gearshift is considerably different in that it is made up of a larger number of component parts. It has a shorter wheel base and on rough roads the frame is subjected to greater twisting stress as the twisting effect must be absorbed by shorter frame bases. The cab-over-engine tractors used by the petitioner in the taxable years were the lightest tractors that would haul a 50,000 pound gross load with any degree of good *107 service. They had a shorter span of life than that of a heavier tractor which pulled the same gross weight. They are lighter in weight than the conventional type tractors, and being shorter they are used to pull larger trailers with heavier loads than the conventional type. Because of the use of synthetic fibers and light weight metals in recent years, the commodities transported by the petitioner have increased in bulk in relation to their weight. Such increase in bulk has forced the petitioner to use larger and lighter trailers in order to be able to operate at a profit. Prior to 1950 the trailers used by the petitioner were of steel construction. The trailers acquired since that time have been made of aluminum. Changes made by the manufacturers in trailers since 1949 have been for the purpose of decreasing their weight and increasing the inside cubic content. The useful life of aluminum trailers is shorter than that of steel trailers. In the years 1950 and 1951 the petitioner operated its line haul tractors an average of 125,000 to 130,000 miles per year per tractor. The maximum useful mileage of the kind of tractor that was used in the business of the petitioner is about 500,000 *108 miles. The average mileage of each trailer used by the petitioner was from 80,000 to 100,000 miles per year. The petitioner did not always have funds available to purchase new tractors to replace those which had passed the point of economic use on line hauls. It used such old tractors for city pickup and delivery service and for spotting trailers at the terminals. By using its older tractors for these purposes the mileage on them was kept low, and they were operated near the petitioner's repair shops. During the years 1945 to 1951, inclusive, the petitioner disposed of 56 of its tractors. Of this total, 20 were sold, 24 were tradedin, 7 were junked, and insurance was collected on 5 of them. The over-all average age of the 51 disposed of in that period by sale, trade-in, or junking was 38 months. During the same period, 1945 to 1951, inclusive, the petitioner disposed of a total of 188 trailers. Of these 21 were sold, 158 were traded-in, 3 were junked, and insurance was collected on 6. The over-all average age of the trailers sold, traded-in and junked was 32.6 months. The petitioner did not sell any tractors or trailers in either of the years 1950 or 1951, although many were traded. *109 The petitioner had on hand 116 tractors at the close of 1950 and 150 at the close of 1951, the respective average ages of which were approximately 41 months and 38 months. It had on hand 152 trailers at the close of 1950 and 175 at the close of 1951, the respective average ages of which were approximately 12 months and 16 1/2 months. In the years 1946 to 1951, inclusive, the petitioner sold and traded-in tractors and trailers as shown below. The figures under the column "Cost less Depreciation" represent costs less depreciation computed on the basis of a 4-year life for the tractors for all years, a 4-year life for the trailers for those disposed of in 1945 and 1946, and a 5-year life for those disposed of in later years. Tractors
Cost Less
Years
Total
Depreciation
No.
Selling Price
No.
Trade-in Price
1945, 1946
15
$ 56,737.52
15
$71,955.00
1947, 1948, 1949
18
8,341.07
5
10,500.00
13
$ 7,672.04
1950, 1951
11
3,787.94
11
10,080.00
Trailers
1945, 1946
33
34,806.80
20
43,653.42
13
17,142.45
1947, 1948, 1949
54
41,906.21
1
40.00
53
54,737.75
1950, 1951
92
160,255.45
92
242,733.00
The prices *110 received by the petitioner on sales and trade-ins of used equipment were influenced by shortages of equipment during and following World War II and the later Korean conflict, and the consequent increased prices of new and old equipment. The price of the tractors purchased by the petitioner was $2,500 per tractor in 1940, $4,909 in 1946, and $7,022 in 1951. The prices of trailers purchased by the petitioner increased over the period 1945 to 1951. On one model of trailer that was used extensively by the petitioner the list price in 1950 was $5,400 and in 1951 it was $6,477. Tractors and trailers which were purchased without trade-in allowances were carried on the petitioner's books, for depreciation purposes, at cost, less the cost of tires and tubes on the equipment, and less salvage value. Tractors and trailers in the acquisition of which there were trade-in allowances were carried on the books at a figure computed by adding to the amount of the cash differential the remaining basis of the equipment traded-in (basis less accumulated depreciation), and deducting the cost of tires and tubes and salvage value. The cost of tires and tubes was treated by the petitioner as a current expense. *111 On purchases of tractors and trailers by the petitioner the invoice prices of new equipment were higher when old equipment was traded-in than when no trade-in was involved. In making trade-in allowances to the petitioner, the dealers did not expect to realize on sales of the traded-in equipment amounts equal to the amounts that they allowed as deductions from the list prices. Some of the equipment traded-in by petitioner on new equipment was sold by the dealers and some of it was junked by them. From the date of its organization in 1942 to the year 1951, inclusive, the petitioner claimed on its income tax returns deductions for depreciation on its tractors and trailers on a straight-line method, based in all instances on an expected useful life of four years. Both the petitioner and the respondent have used the same salvage values, namely, approximately 10 per cent of the cost of equipment acquired prior to 1950, and $400 for tractors and $300 for trailers acquired in the years 1950 and 1951. For the years 1947, 1948, and 1949 the petitioner and the respondent agreed upon a settlement of the petitioner's tax liability in which the petitioner's tractors were treated as having a *112 useful life of five years and its trailers as having a useful life of six years. The settlement agreed upon by the parties involved other issues relating to officers' salaries and officers' expenses, in addition to the issue of depreciation allowances. In determining the deficiencies herein, the respondent computed allowable depreciation deductions on the basis of a useful life of the tractors of five years and a useful life of the trailers of six years. The average useful life of the tractors used by the petitioner in its business in the years 1950 and 1951 was four years. The average useful life of the trailers used by the petitioner in its business in the years 1950 and 1951 was five years. Opinion ATKINS, Judge: The question presented relates to the amount of depreciation deductions properly allowable to the petitioner upon tractors and trailers used in its motor freight business. Section 23(1) of the Internal Revenue Code of 1939 provides for the deduction of "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of property used in the trade or business. The proper allowance for depreciation is that amount which *113 should be set aside for the taxable year whereby the aggregate of the amounts so set aside, plus the salvage value will, at the end of the useful life of the property, equal the cost or other basis of the property. Section 29.23(1) of Regulations 111. [1]United States v. Ludey, 274 U.S. 295. The reasonableness of depreciation claimed is to be determined in the light of the conditions known to exist at the end of the period for which the return is made. And it has been held that "A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." Burnet v. Niagara Falls Brewing Co., 282 U.S. 648. *114 In its returns for years up to and including the years in question, the petitioner has always taken the position that the useful life of the tractors and trailers alike was four years. In this proceeding it still adheres to its claim of a 4-year life for its tractors but contends for a 5-year life for its trailers. In determining the deficiencies the respondent held that the tractors had a 5-year life and the trailers a 6-year life. On brief the parties are at odds as to the precise issue presented for decision. The respondent states that the issue is whether the petitioner's rates of depreciation or, in the alternative, the salvage values, should be adjusted so that the adjusted basis of the equipment disposed of will approximate the consideration received therefor upon disposition. The petitioner states that the sole issue is the length of useful life of the equipment. Neither the deficiency notice nor the schedules attached thereto indicate that any part of the deficiencies is due to any adjustment on account of salvage value used by the petitioner. In its petition, the petitioner alleged error on the part of the respondent in determining the useful life of its tractors and *115 trailers. In his answer the respondent merely denied this allegation of error, and did not allege any error in his determination of the salvage value. In addition thereto the parties stipulated as follows: "Both the petitioner and the respondent have used the same salvage values, i.e., approximately 10 per cent of the cost basis of equipment acquired prior to 1950 and $400.00 for tractors and $300.00 for trailers acquired in 1950 and 1951." The Parties also stipulated: "In connection with its business the petitioner owned and operated during 1950 and 1951 a large number of tractors and trailers. Such tractors and trailers are correctly described as to year of acquisition, unit number, make, model, year of disposition, cost, cost less salvage value, and reserve for depreciation as of December 31, 1949, in Exhibits C and D attached to the statement accompanying the statutory notice of deficiency. The remaining data shown in such exhibits involve matters in controversy in this proceeding and are not intended to be stipulated." (Italics ours) It thus appears that the parties themselves in their stipulation have narrowed the issue so as to exclude any question of salvage value. *116 Under these circumstances the issue of the salvage value is not before us for decision. See Robert C. Coffey, 21 B.T.A. 1242, Warner G. Baird, 42 B.T.A. 970, Wentworth Manufacturing Co., 6 T.C. 1201. Accordingly, we will confine our decision to the single issue of the useful life of the tractors and trailers. The evidence in the case gives us a fairly comprehensive picture of the factors in the petitioner's operations which contributed to the wear and tear and obsolescence of its rolling stock and resulted in a shorter useful life than might exist in other types of operations in the same industry. We know from the stipulation that part of the mileage over which the petitioner operated its tractor-trailers was mountainous. The petitioner's witnesses, who were experienced in various phases of the freight transportation business, have described the physical wear and tear upon tractors and trailers that is consequent upon operation over such terrain. It shortens their useful life. The more or less continuous operation of the tractors, and their operation by different drivers tend to shorten the useful life of the tractors. The witnesses have also *117 described obsolescence factors and their effect on the petitioner's equipment. These factors include state laws which affect the weight and size of rolling stock that may be used on the highways. Changes in such legislation brought about changes in the petitioner's equipment at times when the equipment on hand might otherwise have been serviceable. The increasing tendency of shippers to ship commodities which are lighter in weight but bulkier required that the petitioner meet the changing trend toward larger and lighter trailers by obtaining such trailers at times that were within the otherwise useful life of trailers on hand. The practical effect of the factors which affected the useful life of the petitioner's equipment is shown in the length of time of use of equipment that was disposed of by the petitioner. Over the years 1945 to 1951, inclusive, the petitioner sold 20 tractors, traded-in 24, and junked 7, a total of 51. The average age of all of such tractors was 38 months. Over the same period of years, the petitioner sold 21 trailers, traded-in 158, and junked 3, a total of 182. The average age of such trailers was 32.6 months. Such dispositions would not have been made, according *118 to the testimony, if the equipment had not passed the point of economic usefulness either by reason of depreciation or obsolescence. The evidence establishes, and we have found as a fact and hold, that the useful life of the petitioner's tractors was four years and the useful life of its trailers was five years. A part of the respondent's argument on brief in effect is that the petitioner must have understated the length of the useful life of its tractors and trailers in view of the fact that upon disposition thereof, both by sale and upon exchange for new equipment, it received amounts largely in excess of the depreciated cost thereof. This, however, does not necessarily follow. In Weir [Wier] Long Leaf Lumber Co., 9 T.C. 990, reversed on other issues, 173 Fed. (2d) 549, we stated in part: "* * * The sole fact therefore in any specific situation that a given price is received for articles not fully depreciated throws no light on the effect upon the depreciation allowance. Thomas Goggan & Bro., 45 B.T.A. 218. If a higher price was available for their automobiles because of a miscalculation as to their useful life, a different result would *119 follow from an enhanced sale price due to appreciated values. * * * The depreciation deduction can not be disallowed merely by reason of the price received for the article without consideration of other factors." Thos. Goggan & Bro., 45 B.T.A. 218, involved the trade-in of a used automobile on the purchase of a new automobile. We stated: "* * * Certainly, the amount of the trade-in value allowed on an automobile which has been used in a trade or business for a given period can not be said to determine the amount or the rate of the depreciation to be allowed on it in any year of its use." In the instant case it has been shown that the prices received by the petitioner upon disposition of its used equipment were higher than their depreciated cost principally because of the shortage of such equipment during and following World War II and the Korean conflict, and the fact that consequently the prices of both new and old equipment had increased. Furthermore, it has also been shown that amounts received upon trade-ins were not truly representative of the value of the equipment, but rather were artificial figures resulting from price concessions made by the new equipment *120 dealers. Under the circumstances of the instant case, it is clear that the fact that the petitioner received upon disposition of its used equipment amounts in excess of depreciated cost does not indicate that such equipment had a longer useful life in the petitioner's business than claimed by the petitioner. If there was error in the petitioner's estimates of salvage value, correction thereof cannot be made by changing the rate of depreciation based upon the useful life of the property in the petitioner's business. Each factor in the depreciation computation is to be separately considered and adjusted if it appears at the end of the taxable year that it is erroneous. See Wier Long Leaf Lumber Co., supra. The parties are in agreement that certain other issues raised by the pleadings relating to sales of property and state income taxes will be controlled by our decision upon the depreciation issue. These matters will be disposed of upon the recomputation under Rule 50. In addition to the facts stipulated which we have found in our Findings of Fact, the parties have stipulated as follows: "In determining the adjusted excess profits net income of the petitioner for *121 1950, the amount of interest to be added pursuant to the provisions of Section 433(a)(1)(0) of the Internal Revenue Code of 1939 is $3,745.67, instead of the sum of $24,370.02 so added by the respondent in the statutory notice of deficiency, and the Court may enter its decision accordingly on this issue. * * *
"The petitioner failed to accrue for 1951, Social Security taxes in the sum of $8,602.15, which is allowable as a deduction in determining its tax liabilities for such year. As a result of this additional deduction, the amount deducted by the petitioner on its return for 1951 for Pennsylvania state income tax was excessive in the amount of $22.59. The Court may enter its decision accordingly with respect to these deductions." These stipulations will be given effect in the recomputation under Rule 50. Decision will be entered under Rule 50. Footnotes
1. SEC. 29.23(1)-1. * * * The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis of the property determined in accordance with section 113. * * *
SEC. 29.23(1)-5. Method of Computing Depreciation Allowance. - The capital sum to be recovered shall be charged off over the useful life of the property, either in equal annual installments or in accordance with any other recognized trade practice, such as an apportionment of the capital sum over units of production. Whatever plan or method of apportionment is adopted must be reasonable and must have due regard to operating conditions during the taxable period. The reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made. If the cost or other basis of the property has been recovered through depreciation or other allowances no further deduction for depreciation shall be allowed. The deduction for depreciation in respect of any depreciable property for any taxable year shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis. * * *↩