EDWARD V. LANE AND KATHERINE R. LANE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79061. Filed November 14, 1961.

*Fielding H. Lane, Esq.*, and *George E. Link, Esq.*, for the petitioners.

*Cyrus A. Johnson, Esq.*, and *Edward H. Boyle, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent determined a deficiency in income tax against the petitioners for the calendar year 1953 in the amount of $142,307.78. For the succeeding year 1954, he determined an over-assessment in petitioners' income tax in the amount of $11,248.07.

The issues presented for decision are:

(1) Whether in computing (on the so-called completed contract basis) the profit realized on a long-term construction contract performed by the principal petitioner's sole proprietorship, said petitioner correctly deducted as depreciation and amortization, the entire cost of certain equipment, furniture and fixtures, and camp and plant facilities which were used in performing the contract, without taking into account any amount for salvage value with respect to the mentioned items—which items were actually sold by said petitioner at and shortly after completion of the contract, to his wholly owned corporation at about one-half of their cost.

(2) Whether, if the entire cost of the above-mentioned equipment, furniture and fixtures, and camp and plant facilities was properly included in the costs and expenses of performing the contract (so as to give the petitioner a zero basis for such items), the gain realized by the principal petitioner upon the sale of such items to his wholly owned corporation is fully taxable as ordinary income, by reason of the provisions of section 117(o) of the Internal Revenue Code of 1939, rather than as long-term capital gain as returned by the petitioner. (This isssue will be reached for decision only if petitioner prevails in whole or in part on the first issue.)

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts and the exhibits identified therein are incorporated herein by reference.

Petitioners Edward V. and Katherine R. Lane were, during the years 1953 and 1954, husband and wife, with residence in Palo Alto, California. They filed a joint Federal income tax return for each of the calendar years 1953 and 1954 with the district director of internal revenue at San Francisco, California. The husband, Edward V. Lane, will hereinafter be referred to as the petitioner.

Petitioner has been engaged in the engineering and construction business, either as a partner, sole proprietor, corporate officer, or employee ever since his graduation from engineering school in 1932. From 1948 to 1954, he conducted his business operations principally as a sole proprietor, under the name of E. V. Lane Company (hereinafter called the proprietorship). During the years 1952 and 1953, this proprietorship was engaged in handling a long-term construction contract; but it then completed such contract, and shortly thereafter ceased to operate. In February 1952, petitioner and his wife organized a corporation under the laws of the Republic of Panama, which was called Laneco, Inc.; and they have, at all times since incorporation, owned all of the issued and outstanding shares of the capital stock of said corporation.[1] Laneco, Inc., has performed all of its work during and after the taxable years in areas outside the United States and its possessions.

Petitioner confined his proprietorship's operations to the performance of contracts for the installation of petroleum pipelines and for the erection of refineries and chemical plants. In September 1951, petitioner (acting as sole proprietor of the proprietorship) submitted a bid on a construction contract for the United States Government, to be awarded by the Okinawa Engineer District of the Far East Command of the Department of the Army, covering certain work on the island of Okinawa in the Ryukyu Islands. Shortly thereafter, on October 16, 1951, the proprietorship's bid was accepted; and it was awarded contract No. DA–92–320–FEC–107 (hereinafter, for convenience, called contract 107).

Briefly described, contract 107 called for the building of steel oil-storage tanks and the installation of these tanks underground; the laying of oil pipeline from the storage tanks to pumping stations; the erecting of pumping stations; the laying of distribution lines from the pumping stations to an airfield and certain other areas; and the building of certain roads and bridges alongside the above-mentioned pipelines. The total estimated price bid by the proprietorship for the performance of contract 107 was $4,603,893.71. The contract was to be completed within 600 calendar days (subject, however, to extensions of time for performance) after receipt by the proprietorship of notice to proceed thereunder. The proprietorship commenced work on contract 107 on November 10, 1951.

In order to carry on its work under contract 107, the proprietorship constructed certain plant facilities on the island of Okinawa, such as warehouses, and an office building, and it purchased automotive

[1] At or about the same time that Laneco, Inc., was organized, petitioner and his wife organized another corporation, of which they were the sole stockholders, called E. V. Lane Corporation. The latter corporation was organized under the laws of the State of Nevada, and was utilized for the performance of construction contracts within the continental United States. Its operations are not involved in the instant case.

and construction equipment (such as trucks, mobile cranes, and bulldozers), as well as certain office furniture and fixtures and certain fixtures and equipment for its plant buildings. In addition to the foregoing items, the proprietorship also erected on land under the control of the United States Government (located within the boundaries of one of the United States Army's military camps) certain concrete-block buildings which served as a camp or living quarters for American personnel brought by the proprietorship to Okinawa for work on contract 107. In connection with its camp, the proprietorship also purchased furniture and fixtures for use therein.

Contract 107 provided, with respect to the disposition of the buildings erected for the proprietorship's camp and plant, that the same would be removed at the petitioner's expense upon completion of the work. However, the contract contained the further provision, that with the Government's written consent, the buildings would not have to be removed.

The following table shows the cost to the petitioner's proprietorship of the equipment, furniture, fixtures, and camp and plant facilities above mentioned:

| | |
|---|---|
| Automotive and construction equipment, office furniture and fixtures, plant fixtures, and equipment | $240, 312. 09 |
| Camp and plant facilities | 140, 227. 11 |
| Total | 380, 539. 20 |

The parties have stipulated that all of the above items represented property used in petitioner's trade or business.

The weather and operating conditions under which the proprietorship's equipment was to be employed on contract 107 were conducive to more than normal deterioration thereof. The atmosphere on Okinawa is very humid and has a high salt content, due to the heavy rainfall and the island's location in the Pacific Ocean. These atmospheric conditions would tend to cause a greater rust problem than would be encountered at a contract site in a more temperate weather zone. Moreover, petitioner anticipated that it would be necessary to operate the automotive and construction equipment 9–10 hours per day 6 days per week, in order to complete the contract within the specified time. Also, natives of Okinawa were to be employed to operate the equipment; and they were unskilled and unfamiliar with the equipment, and therefore were expected to cause damage to the equipment. In the light of the foregoing factors and in the light of the further factor that petitioner, at the time he commenced work on contract 107, anticipated that there would be no market for any of the equipment, furniture, and fixtures, and camp and plant facilities at the time when the job was completed, he determined to write off the entire cost of said assets (without making any allowance for

salvage value therefor) as part of the costs and expenses of performing said contract.

The proprietorship completed approximately 98 percent of the work on contract 107 by May 1953. Then or shortly thereafter, it was granted an extension of time, and it entirely completed performance of the contract in November 1953, when the Government accepted the work. Despite the adverse weather and operating conditions above described, petitioner was able to keep the proprietorship's equipment in serviceable operating condition, by reason of a thorough repair and maintenance program. The result was that in May 1953, when contract 107 was 98 percent completed, said equipment was not entirely worn out, as petitioner had anticipated that it would be. And further, as will presently be shown, petitioner found a market for the sale of such equipment, as well as the furniture and fixtures, and camp and plant facilities, again contrary to his original expectations.

As hereinabove found as a fact, petitioner and his wife formed Laneco, Inc., in February 1952. Laneco, Inc., performed subcontract work for the proprietorship on contract 107, in the amount of $847,730; and in addition, in 1952, said corporation received contracts for its own account from the United States Air Force for the erection of quonset huts at an airbase located on Okinawa. In May 1953, petitioner submitted on behalf of Laneco, Inc., a bid with respect to the construction of facilities of the same type as that which had been covered by the proprietorship's contract 107. Laneco, Inc., was the successful bidder; and it was awarded a contract therefor on May 27, 1953. This contract, which will be designated herein as contract 142, was for approximately $1,700,000.

In order to perform contract 142, Laneco, Inc., purchased substantially all of the equipment, furniture, fixtures, and camp and plant facilities which the proprietorship had acquired or erected and used on its contract 107. Purchases of said items were made by Laneco, Inc., at various times during 4 months of 1953; and the final purchase was made on February 1, 1954. The following table shows the amount purchased by Laneco in each of the 4 months of 1953, and on February 1, 1954:

*1953*

| | |
|---|---:|
| June | $ 4, 175. 00 |
| July | [1] 79, 500. 00 |
| August | 1, 337. 50 |
| October | 26, 600. 00 |
| Total purchased in 1953 | $111, 612. 50 |
| Purchased on Feb. 1, 1954 | 75, 710. 00 |
| Grand total of Laneco's purchases from the E. V. Lane Co. proprietorship | 187, 322. 50 |

[1] $76,000 of this amount represents the purchase price of all of the camp and plant facilities.

As hereinabove found as a fact, the original cost of the assets sold to Laneco, Inc., was $380,539.20.

The sales prices of the aforementioned equipment, furniture, fixtures, and camp and plant facilities were established by supervisory employees of the proprietorship. Independent appraisals by employees of the Army's district engineer, and by certain other individuals who were familiar with such equipment were sought by the proprietorship; and these appraisers concurred in the prices fixed by the proprietorship employees with respect to 12 trucks sold to Laneco in October 1953, as well as in the prices fixed for the sundry items of automotive and construction equipment and plant fixtures and equipment, which were sold on February 1, 1954. The appraisers were not asked to appraise any of the items of property sold to Laneco, Inc., in the months of June, July, and August 1953.

Laneco, Inc., continued to use the camp and plant facilities purchased from the proprietorship until sometime late in 1955 or early in 1956, at which time they were torn down. The record does not reveal for how long Laneco, Inc., used the equipment, furniture, and fixtures which it bought, or what disposition it has made thereof.

Petitioner, in the joint return which he filed with his wife for the year 1953, reported the profit which he had derived from his proprietorship from contract 107 on the so-called completed contract basis. On such basis, he reported the entire amount received from the Government under the contract during the years 1951, 1952, and 1953; and he deducted from such receipts all of the costs and expenses claimed to have been incurred during said years in the performance thereof. Among such costs and expenses were depreciation of equipment, furniture, and fixtures and amortization of camp and plant facilities—in the total amount of $380,341.13. The last-mentioned amount represented the entire cost of the said items (with the exception of $198.07 [2]). Petitioner did not take into account any salvage value for the above-mentioned assets in computing his deductions for depreciation and amortization. Also, on his 1953 return, petitioner reported the $111,612.50 received from Laneco, Inc., and he treated such amount as a long-term capital gain, against which he applied a zero basis. Similarly, in the 1954 return filed by petitioner and his wife, he reported the $75,710 received from Laneco, Inc., in that year; and he treated the same as a long-term capital gain, against which he applied a zero basis.

The respondent, in his statutory notice of deficiency, determined that the deduction claimed for depreciation and amortization was excessive

---

[2] For reasons not explained in the record, petitioner did not fully depreciate three pickup trucks. Rather, he depreciated all except $198.07 of the cost of said trucks. Such trucks were the only items of equipment not fully depreciated by petitioner.

to the extent of $187,124.43. The respondent explained his action as follows:

Included in the computation of costs and expenses applicable to the contract [i.e., contract 107] there is included the actual cost of equipment and facilities on hand January 1, 1953 plus the cost of acquisition of additional equipment (excepting $198.07) in 1953. Thus, in computing the costs and expenses applicable to the completed contract in 1953, no consideration was given to the salvage value of the equipment or plant facilities.

The salvage value of the equipment and plant facilities based on sales of salvable items of Laneco Inc., a foreign corporation, in which the total outstanding shares are owned by you is $187,322.50. The sales were made at appraised values determined by your employees and independent appraisers.

Respondent made a complementary adjustment for 1953, by which he eliminated from income the long-term capital gain reported by the petitioner on the sale of equipment and facilities to Laneco, Inc., in 1953, in the amount of $55,707.22. Respondent explained this complementary adjustment as follows:

(c) * * *

It is held that the sale of equipment and plant facilities represents recovery of salvage value and no capital gain resulted from such sale. If any portion of the sale was held to be a sale made in excess of the salvage value determined under item (a) above, the gain would be considered ordinary income under the provisions of section 117(o) of the 1939 Internal Revenue Code.

### OPINION.

The first issue presented for decision in the instant case concerns the amount of depreciation and amortization properly deductible by the petitioner in computing the profit realized by his proprietorship from the performance of contract 107. Petitioner elected to use the completed contract basis for computing that profit; and he deducted, as depreciation and amortization, substantially all of the cost which he had incurred in acquiring and constructing the assets so depreciated and amortized. The case is before us because, in computing said deductions, petitioner did not assign any salvage value to the depreciable and amortizable property; whereas the respondent determined that the property did have a salvage value, that the amount thereof was equal to the price at which petitioner sold the depreciable and amortizable property, and that the depreciation and amortization deductions should be reduced by the amount of the salvage value.

Section 23(l) of the here controlling Internal Revenue Code of 1939, allows a deduction for depreciation of a "reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business." The proper allowance for such depreciation is "that amount which should be set aside for the taxable year * * * whereby the aggregate of the amounts so set aside, *plus the salvage value*, will,

at the end of the useful life of the depreciable property, equal the cost or other basis of the property." (Emphasis supplied.) Regs. 118, sec. 39.23(1)-1. The language quoted from the regulations represents practically a verbatim adoption by the Internal Revenue Service of the language used by Justice Brandeis in the Supreme Court's opinion in the leading case of *United States* v. *Ludey*, 274 U.S. 295. That the taking into account of an accurate and correct salvage value is of critical importance in the computation of a "reasonable allowance" for depreciation, is the clear teaching of the recent Supreme Court case of *Massey Motors, Inc.* v. *United States*, 364 U.S. 92. The Court there pointed out that recognition of salvage value was necessary if income is to be correctly reflected; for, otherwise, the depreciation deduction would be overstated, and income consequently understated. Further, the Court pointed out that the use of a zero salvage value for property sold after its useful life in a taxpayer's business, could lead to a result not contemplated by Congress, viz, the reaping of profits (taxable at more favorable capital gains rates) as the result of the use of excessive depreciation deductions which lower the income taxable at ordinary income rates. Thus, there can be no doubt that salvage value must be recognized.

Petitioner seeks to avoid the application of this proposition in the instant case by two contentions. First, he asserts as a factual proposition that the equipment, furniture, and fixtures actually were fully exhausted through use in performing contract 107. And, as regards the camp and plant facilities, he urges that they were situated on land controlled by the Government which (under the terms of contract 107) could order them dismantled and removed after the completion of the contract, and, therefore, that they had no value. Based upon these premises, the petitioner argues that he correctly charged off the entire cost of these assets. We conclude that his premises are faulty. The record demonstrates that the equipment, furniture, and fixtures were still in operating condition, due to the fact that petitioner had used good maintenance practices thereon; and that these items continued to be used by Laneco, Inc., in its work on contract 142. The record further establishes that the Government practice was to allow buildings such as the camp and plant facilities, to continue to be used so long as there was a need therefor. And Laneco, Inc., did continue to use the camp and plant facilities until late 1955 or early 1956, when it completed its work for the Government, at which time said facilities were torn down.

As further evidence that the assets here involved were not in fact fully depreciated, there is the fact that petitioner was able to sell the same at an amount equal to approximately one-half of their cost— and

this at the very moment when petitioner claims they were fully spent and useless. The reasonableness of the sales price of much of the assets is attested by the fact that independent appraisers concurred in the prices set thereon by the petitioner.

We must reject petitioner's first contention above stated.

The second string to petitioner's bow is a legal one. In essence, the contention is this: The estimate of zero salvage value, which petitioner *anticipated* (at the commencement of operations on contract 107) that the property would have at the completion of said contract, is controlling; and it makes no difference if in fact the property did *actually* have a salvage value at the completion of the contract. Even if we assume that his anticipations were reasonable (a matter by no means certain on this record), we must still reject his second contention.

Laying to one side, for the moment, the fact that petitioner elected to compute his profit on contract 107 on the completed contract basis, petitioner's argument is unsound even as applied to a taxpayer who computes depreciation, with respect to assets used in his business, on a year-to-year basis. This Court stated in *Wier Long Leaf Lumber Co.*, 9 T.C. 990, 998, reversed on another issue 173 F. 2d 549 (C.A. 5):

It has long been the rule that depreciation deductions are to be corrected in any year when it is apparent that the factor involving the extent of useful life is erroneous[2] (see e.g., *Washburn Wire Co.* v. *Commissioner* (C.C.A., 1st Cir.), 67 Fed. (2d) 658), and that the reasonableness of a deduction for depreciation is to be determined upon conditions known to exist at the end of the period for which the return is made. Regulations 111, sec. 29.23 (1)–5. See *Commissioner* v. *Mutual Fertilizer Co.* (C.C.A., 5th Cir.), 159 Fed. (2d) 470. An adjustment to correct for mistaken salvage value is no different from an adjustment of a mistaken estimate of years of use. In this manner depreciation can be kept to an accurate provision for the return of petitioner's capital investment in the property. This is what the law contemplates. See *Helvering* v. *Virginian Hotel Corporation*, 319 U.S. 523. [Footnote omitted.]

And, in the more recent case of *Cohn* v. *United States*, 259 F. 2d 371 (C.A. 6), the Sixth Circuit defined the issue to be "whether salvage value can be adjusted at or near the end of the useful life of the asset when it is shown by an actual sale of the asset that there is a substantial difference between what was estimated and what it actually is"; and the court further stated the taxpayer's "fundamental contention [to be] that salvage value, having been determined at the time of acquisition, can not be redetermined at any time thereafter." The court then proceeded to resolve the stated issue, against the taxpayer, in the following language:

On the basis of the settled principles hereinabove referred to, we do not agree with appellants' contention. Depreciation involves a combination of useful life

and salvage value, both estimated. If, under certain circumstances, depreciation can be reconsidered through a redetermination of useful life, it would seem logical to permit at least at the same time, a reconsideration and redetermination of salvage value. * * * [Citing *Wier Long Leaf Lumber Co.*, 9 T.C. 990.]

The foregoing authorities involved taxpayers who were actually faced with the necessity of estimating a salvage value of depreciable assets at the time of acquiring the same. In the instant case, however, the petitioner faced no such necessity. He elected to compute his profit, as we have said, on the completed contract basis. Depreciation, under that method, is an amount equal to cost of the assets, less the salvage value thereof. And depreciation is not taken, under said method, pro rata over the years during which the contract is performed; but, rather, it is taken as one lump sum, in the year when the contract is completed. Therefore, salvage value of depreciable assets need not be fixed at the commencement of the contract; it must be found, and deducted from cost, when the contract is completed. It is thus seen to be totally immaterial and irrevelant, what petitioner's anticipation of salvage values were when these assets were acquired.

There remains the question, under this issue, of whether the sales prices of the assets to Laneco, Inc., represented salvage value. The Supreme Court, in *Massey Motors, supra*, indicates that resale value is an accurate measure of salvage value. And, we think, the Sixth Circuit approved actual sales price as an accurate yardstick for measuring salvage value. In the instant case, most of the property involved was actually sold prior to completion of the contract in November; and all of it had been sold prior to the time when petitioner filed his 1953 return. In such circumstances, we think it was correct, and fair and reasonable, for the respondent to use, as he did, the actual sales prices as the measure of salvage values.

We sustain the respondent on this issue.

We do not reach the second issue framed in our preliminary statement. That issue is whether, if the petitioner's basis for the assets sold to Laneco, Inc., were less than the sales price, the resultant gain would be taxable to him as ordinary income (rather than long-term capital gain), under the provisions of section 117(o) of the 1939 Code. Our holding under the first issue in the instant case, has the effect of equating petitioner's basis for the assets, with the sales price thereof. See section 113(a) and (b)(1)(B)(i) of the 1939 Code. Hence there was no gain on the sale to be taxed.

*Decision will be entered for the respondent.*